(80 South. 717)

No. 21619.

AMACKER v. KENT.

(Jan. 6, 1919. Rehearing Denied Feb. 3, 1919.)

*(Syllabus by the Court.)*

1. PARTNERSHIP ☞17, 22 — RELATION — INTENTION.

Where the question of partnership vel non is to be determined between the parties to a contract, the main inquiry is to be directed to the ascertainment of their real intention; if, however, some essential element required by law to constitute a partnership is omitted, the contract is not one of partnership, no matter what it may be called; but, though not constituting a partnership, it may be valid and enforceable for all the purposes for which it was made.

2. PARTNERSHIP ☞17 — INTENTION OF PARTIES—RELATION—LOSSES.

Where one party agrees to furnish the capital and the other his time and services for the establishment and prosecution of the business of buying and selling cattle, the net profits to be equally divided between them, but there is no mention of the word "partnership" and no stipulation with respect to the liability for the losses which may be incurred, the determination of the question whether a partnership was intended, or whether it was intended that the party furnishing the time and services should be exempted from losses, save as deducted in the ascertainment of profits, will depend upon the various surrounding circumstances, including the manner in which the contract was entered into and executed, the financial positions of the parties, respectively, etc.

*(Additional Syllabus by Editorial Staff.)*

3. PARTNERSHIP ☞53 — RELATION — EVIDENCE.

In action for damages and for liquidation of an alleged partnership, whereby defendant was to furnish the capital and plaintiff his time and services in the business of buying and selling cattle, evidence *held* to show the making of a contract, though not strictly one of partnership, entitling plaintiff to one-half of the profits.

4. APPEAL AND ERROR ☞1177(1)—PARTNERSHIP ☞344—SETTLEMENT—JUDGMENT.

In action for settlement of the balance due plaintiff in a transaction not yet completed, a judgment for plaintiff for a specific amount was premature when rendered before settlement was reached, and case should be remanded for further liquidation of the transaction and ascertainment of balance due plaintiff.

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; W. Schofield Rownd, Judge.

Action by Richard M. Amacker, Jr., against R. A. Kent, with demand in reconvention. Judgment for plaintiff for a certain amount with interest and for defendant on his demand in reconvention, and plaintiff appeals, and defendant, answering, prays that the judgment be amended. Judgment affirmed to the extent of rejecting plaintiff's demand for damages, and in other respects reversed and case remanded, with directions to settle accounts.

Ponder & Ponder, of Amite, for appellant. Purser & Magruder, of Amite, for appellee.

Statement of the Case.

MONROE, C. J. Plaintiff alleges that defendant induced him to engage with him, as a partner, in the business of buying and selling cattle, defendant to furnish the capital and plaintiff his time and services, and, after paying expenses, the net profits to be equally divided; that the partnership has never terminated by any agreement, but that defendant refused to divide certain profits, including 32 head of cattle, thereafter refused to continue furnishing capital, or to go on with the business; and that, by reason of his action and inaction, he (plaintiff) was thrown out of employment at an unfavorable season for obtaining re-employment, and

thereby, and in consequence of certain expenditures on defendant's property, has suffered loss and damage to the extent of $1,-000. He prays for judgment ordering the liquidation of the partnership and condemning defendant to pay the amounts that may be found due him.

Defendant, reserving the benefit of certain exceptions filed by him, answered denying specifically that he induced plaintiff to enter into any contract with him, denying that there was any partnership between them, or that he refused to go on with the contract that he did enter into, and alleging, in substance: That in February, 1913, plaintiff proposed to buy cattle for his (defendant's) account, with defendant's funds, and to accept as his compensation one-half of the net profits to be realized from the sale of such cattle as he might locate and buy, after deducting the cost of feeding, handling, etc., which proposition was accepted and resulted in a verbal contract in accordance therewith, and that, acting under the same, plaintiff located, purchased, and, by means of checks drawn in defendant's name and against his bank account, purchased sundry lots of cattle which were sold, and the profits derived therefrom equally divided between them; that the business was that of defendant, and that plaintiff was, at no time, liable for its losses, or interested, as a partner, in the cattle for the purchase and sale of which it was established and conducted; that there was no stipulation as to the duration of said contract; and that, plaintiff having demanded a settlement, a full, complete, and final settlement was made. "And respondent avers that, on said settlement, as shown by the itemized statement of account, hereto annexed, plaintiff is indebted to respondent in the full sum of $229.76"; denies that there were any other items, "transactions, business dealings, or other statements of fact, excepting those shown in the annexed statements and set out herein, which belonged, or now belong, to the plaintiff and respondent, under the said contract." And he prays for judgment rejecting plaintiff's demand, decreeing the contract in question to have been one of hire, decreeing that there has been a full settlement and accounting with respect to the same, that the amount due to him is $229.76, and condemning plaintiff therefor with interest from September 12, 1914.

Considering the facts disclosed by the evidence, in the order of their sequence, we find that, in the latter part of 1912 or early part of 1913, plaintiff and defendant entered into a verbal contract to the effect that defendant should contribute the capital and plaintiff the time and services required for the establishment and conduct of the business of buying and selling cattle, and that the net profits of such business should be equally divided between them, with the further understanding that plaintiff, who had been conducting a dairy, at another place, should have the right to continue that business, and that, defendant furnishing the material, and he, the labor, a barn, on defendant's farm, should be put in condition for its accommodation; the only additional stipulation that seems to have been made, at any time, having been that, in buying the cattle, plaintiff should give checks, signed in defendant's name, "per R. M. Amacker, Jr.," specifying on each check the number of cattle it was intended to pay for, which checks defendant arranged with his bank should be paid from a special account opened by him for that purpose. Nothing was said about the duration of the contract, or the participation of the contractants in any losses that might be sustained, and the word "partnership" is not shown, or said to have been mentioned. Defendant opened on his books an account, called "Cattle Account," in which all the transactions between him and plaintiff, within the terms of their contract, were supposed to be enter-

-ed, which account was balanced from time to time, and, upon the basis of the credit balances thus struck, the profits represented by them appear to have been credited to the contractants, respectively, agreeably to the terms of their contract, without reference, apparently, to any cattle that may have been bought under the contract and left unsold. Some months prior to August 8, 1914, it became understood that a desirable lot of cattle would be sold in the succession of John Saal, a farmer and cattle raiser, as we infer, whose farm was not far away, and defendant frequently consulted plaintiff in regard to their purchase. What he did in that respect, prior to the time of the purchase, is told by himself in his testimony as follows:

"Mr. Amacker and I discussed, a number of times, the purchase of the Saal cattle, and, as I saw it, there were no funds available; and we discussed, at one time, the advisability of seeing Mr. Morgan" (who was connected with a bank), "and see if he would not go in with us, and see if he could not raise money and buy those cattle, and my understanding was that Mr. Morgan would go in and share any such profits as we made in the purchase. I asked Mr. Amacker to go over there and see Mr. Morgan. We discussed it, and he or I agreed on that; I do not remember who proposed it."

Mr. Amacker was, however, unsuccessful in his attempt to interest Mr. Morgan, and defendant tells what was then done in his examination, in chief, as follows:

"Q. Mr. Amacker, in his testimony, said that you sent him to the Saal place, one or more times, to examine the cattle? A. That, I think, was correct. We discussed it a number of times. Mr. Amacker was more anxious that we should buy those cattle, but I never could find where I could raise the money."

The reasons assigned by defendant for sending plaintiff to examine the cattle, prior to the sale, and his explanation of what occurred at the Saal place, on the day of, and before and after, the sale, as developed on cross-examination, reads:

"Q. Mr. Kent, you say that Mr. Amacker was not engaged—I mean was not interested in those Saal cattle. Why did you send him down there several times before you purchased? A. Because we were figuring if we could raise the money—would possibly buy the cattle and handle them, and, at the time of the purchase," (there) "was no agreement, or no thought, of buying the cattle for the cattle account. Did not go down there with any intention of buying them. It was on after consideration. Q. Why did you call him off, down there at the time, and have a close conversation with him with reference to this purchase? A. Because I thought his ideas as to the value of the cattle were worth something. * * * Q. Mr. Kent, I believe you testified yesterday, with reference to that Saal account, that you consulted with Mr. Amacker for two or three months before the purchase? A. Yes, sir. Q. You consulted with him on the morning of the sale and allowed him to fix the price of the cattle, did you not? A. I did. Q. And even have them branded in the brand of the cattle account, the brand of all the cattle that were handled by you all in the cattle account, same brand? A. As a matter of identification. * * * Q. Was there any other brand used in the cattle account except Mr. Amacker's 'A' brand? A. There might have been an 'A' brand on them when bought. Q. I mean used after you bought? A. Not that I know of. * * * Q. How many days was he engaged, the whole time or part of the time, in the Saal matter? A. He was actively engaged, I am sure, for seven or eight days. I moved the cattle. He gave pretty near his whole time. After that, his time given to it was very little."

Having stated that he went to the sale with no intention of buying the cattle, and that, nevertheless, after his arrival, he had a serious conference with plaintiff upon the subject of buying, defendant testifies that a Mr. Wolfe approached him on that subject; and that, after some negotiations (brought about by Mr. Wolfe) with an officer of the bank which was administering the succession of Saal, it was arranged that he (defendant) should make a bid of $4,500 for the entire lot of cattle (167 head) that were to be sold, and that, in the event the bid was accepted, the bank would aid him in financing the transaction. It is admitted, as we have

seen, that plaintiff looked after the cattle during the week or more that they remained on the Saal place, and defendant elsewhere admits that he assisted in driving them "home" (meaning to defendant's farm), looked after them there, and made "several sales," which is stating it rather mildly, as the evidence shows that plaintiff found a purchaser, who, within nine days from that of the sale, bought 74 (out of the 167) head, for which he paid $3,186, and made a number of other sales besides; the impression that we get being that his sales alone realized more than the entire purchase price, leaving more than half the cattle on hand, and the fact being that the "John Saal Cattle Account" (under which title defendant thought proper to have the transaction entered in his books) showed a net profit, within three weeks, of $2,042.54.

Concerning the "settlement" which is set up in the answer, plaintiff testifies that, some time after the purchase of the Saal cattle (and, as it appears, after a large proportion of them had been sold, and a large profit realized), defendant said to him, "I am thinking of giving you a fine John Saal bull, for your part of the John Saal account," to which he (plaintiff) replied: "Yes, sir; is he worth $1,700?" (meaning that $1,700 was his estimate of the value of the part that defendant was thinking of proposing that the bull should represent). Defendant was unable to recall that conversation, but was unwilling to make any other denial than that he did not recall it. He admitted that he had made plaintiff an offer of $500 in the Saal matter, and gives the following explanation:

"Q. (by his own counsel). Mr. Amacker said you wanted to give him $500 for a settlement in the Saal matter; if you made any such offer, what was it for? A. It was for services rendered, and his services, I thought, enabled me to get more profit out of the cattle than, possibly, I would have (made) without his services; and I said that to him at the time I made that proposition. * * * Q. Have you ever settled with him for his services rendered to you in regard to the Saal cattle? A. I have not. Q. Why? A. He refused a settlement. Q. Did that transaction have anything to do, whatever, with the agreement which you and he entered into about the month of February, 1913? A. Not that I intended."

"Q. (on cross-examination). I see, Mr. Kent, that this alleged settlement that you made with Mr. Amacker, * * * during the month of September, 1914, on what you term 'old cattle account,' while the account of the purchase of the John Saal cattle was open, August 8, 1914, and so continuing on from that date, did that settlement include any part of the John Saal cattle, or did it relate exclusively to your old and former bills? A. Old and former bills, referring to the original cattle account? Q. Yes, sir. A. The settlement had with Mr. Amacker was for cattle account. Q. How was that settlement made? A. Credit; half of the net credit was credited to Mr. Amacker's account."

Shortly before closing his examination, defendant's learned counsel asked him whether he desired to make any further statement that would enable the judge to decide the case fairly, and he replied:

"I don't know whether the judge has gotten the full gist of Mr. Amacker's claim. I think the principal part of it has been brought out. It is shown here that we had an account known as the 'Cattle Account,' which was used for the purchase and sale of the cattle handled by Mr. Amacker, the net proceeds of which he was interested in, half. Same account was settled and closed by Mr. Amacker. The contention seems to be on the purchase of cattle made from the estate of John Saal, for which Mr. Amacker assumed that he had the same interest in that purchase that he had in purchases made by himself; and, finally, when Mr. Amacker asked to be settled with, in settling for the account known as the 'Cattle Account,' and he asked for a settlement of the interest in the John Saal cattle, and I told him that he had rendered services in helping to handle these cattle, and I had made a profit on them—had not closed them all out, but was willing to give him $500, as interest he had shown in helping handle those cattle. This amount he refused. The cause of the suit, I imagine."

There was judgment herein in favor of plaintiff for $500, with interest from judicial demand, and, in favor of defendant, on his

demand in reconvention, for $229.76, with interest from September 14, 1914. Plaintiff has appealed, and defendant has answered, alleging that, it having been found that the relation between the parties was that of employer and employé, and the suit being predicated upon the theory of a partnership, plaintiff's entire demand should be rejected, and praying that the judgment appealed from be amended accordingly.

### Opinion.

[1, 2] What the parties to a contract may have agreed upon is a question of fact; whether their agreement, such as it may be, is one which constitutes them the partners of each other, is a question of law, about which the contractants are not unfrequently mistaken. They may be held liable to third persons when, as between themselves, they are not, and never intended to be, partners; but that doctrine is applied when they hold themselves out, or are to be presumed to have held themselves out, to such third persons, as partners, is founded in the doctrine of estoppel, and is not involved in this suit. Where the question of partnership vel non is to be determined, between the parties to the contract, the main inquiry is to be directed to the ascertainment of their real intention. If it be found that they have agreed upon all those matters which, in law, constitute a contract of partnership, it must be presumed that they intended that contract. If, on the other hand, some essential element to that contract is omitted, it is not a contract of partnership, no matter what it may be called. Our Civil Code declares that—

"Art. 2801. Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry, furnished in determined proportions by the parties."

"Art. 2811. It is of the essence of this contract that a profit is contemplated, and that each of the parties is to partake therein. * * *

"Art. 2813. A participation in the profits of a partnership carries with it a liability to contribute between the parties to the expenses and losses. * * *

"Art. 2814. A stipulation that one of the contracting parties shall participate in the profits of a partnership, but shall not contribute to the losses is void, both as it regards the partners and third persons. * * * "

It has, however, been held by this court that such a stipulation is not void, provided the exemption from liability for the losses is based upon a fair equivalent given to the associates by the partner in whose favor it is stipulated, and that the contract, in that respect as well as in other respects, remains in force. Consolidated Bank v. State of La., 5 La. Ann. 59.

In the instant case, plaintiff agreed, as he himself testifies, to put in his time and services against defendant's capital, and, as nothing was said about the losses, it might very well be argued that, under the law, his right to participate in the profits carries with it a liability to contribute to the losses, and that, no doubt, is true, in that the losses incurred in the business are necessarily deducted before any profit can be found, so that all partners suffer the losses in suffering the deduction. If, however, by positive stipulation, surrounding circumstances, manner of its execution, or otherwise, it appears that the parties to a particular contract intended that one or more of them should share in the profits to be derived therefrom and should not share in the losses, over and above the loss of prospective profits, though such a contract may not, under the definitions of our law, be one of partnership, it may, nevertheless, be a lawful contract, and perhaps less objectionable from a moral point of view than a contract in which one becomes liable for losses which he is not able, and has no prospect of being able, to

pay. And so it is that one may share profits, by way of compensation for the time and service which he contributes to the business contemplated, and yet not be liable for the losses incurred, save in so far as they prevent profits from being earned. It is immaterial, in such case, whether he be called an employé, associate, or what not; it is enough that his rights and liabilities are determined by the intention of the contract, and that neither rights nor liabilities are altogether those of a partner.

[3] Considering the financial positions of the parties to this suit, respectively; their silence upon the subject of a partnership relation, and of any liability on the part of plaintiff for loss to be incurred; the opening of their books, as the opening of the "cattle account" may be called, merely in that form; the fact that plaintiff drew the funds furnished by defendant, as an agent and not as a partner, drawing the funds of his firm—all go to satisfy us that the contract in question was neither more nor less than as alleged by plaintiff, a contract for the establishment and conduct of a business in which he was to furnish his time and services against the capital to be furnished by defendant, and in which the profits to be derived from the purchases and sales of cattle were to be equally divided, but in which the losses, if any, sustained in the whole business, save as deductions from the profits, were to be sustained by defendant alone. As it was not stipulated, however, that plaintiff should be exempt from the losses, neither, as we think, was it stipulated that plaintiff's interest should be confined to the profits earned upon cattle located, bought, and sold by him. Defendant appears to be a man of affairs who saw an opening for the making of money in a business which he had neither the time nor the experience to undertake. He, as we infer, had a general store, a brick factory, and a farm on his hands, and it is abundant-ly shown that he considered plaintiff a better judge of cattle and a shrewder trader in that line than himself. When therefore he agreed to establish the cattle business, on the terms stated, it meant, we think, that plaintiff was to share the profits of that business in so far as he might be concerned in it, and whether a particular animal or lot of cattle, purchased to be sold for a profit, were handled by the one or the other of them. If it had been suggested in the beginning that plaintiff was to share in the profits to be derived from handling single animals, or small lots, but that defendant reserved to himself the right to handle all large and more profitable lots, for his separate advantage, it is not likely that any contract would have been entered into; and yet that is what the view taken by defendant, with regard to the deal as to the Saal cattle, would amount to—that having been, by far, the largest and most profitable deal that was undertaken after the contract here in question was entered into. Whilst, however, defendant discussed with plaintiff the prospective purchase of the Saal cattle, using the pronoun "we" in referring thereto and to the raising of the money for the purchase, up to the very time of the purchase, and afterwards had plaintiff to fix the prices at which the cattle were to be sold, to look after them at Saal's place for a week or more, to take them thence to defendant's farm and look after them at the farm, he seems, at some stage of the proceedings, the date of which is not fixed, to have concluded that the buying and selling of the Saal cattle had nothing to do with the business of buying and selling cattle in which he and plaintiff were engaged, and, though he admitted that he owed plaintiff something for the time and services given by him in that matter, he assumed that he had the right to fix the amount of his indebtedness at the sum of $500, which amount he offered to pay and plaintiff refused to accept. The

explanation which defendant gives for the adoption of that view is that, though he discussed the matter with plaintiff, at times, during two or three months; sent him to see if he could interest Morgan in the purchase; sent him, on several occasions, before the sale, to examine the cattle; discussed the question with him at Saal's, on the day of the sale—he did not decide to make the purchase until a way was opened to him to finance the transaction; that though, after the purchase, he further availed himself of plaintiff's time, services, and experience in "allowing him" to fix the selling price of the cattle, in having him spend seven or eight entire days in charge of them, in removing them from Saal's place to the farm, seeing that they were looked after at the farm, and in selling, perhaps, half of them for as much, or more, money than had been paid, or agreed to be paid for the lot, yet that the transaction did not come within his contract with plaintiff, because he finally decided to buy the Saal cattle when on the ground, and he had, somewhat unexpectedly, arranged to pay for them. The explanation does not, in our opinion, subserve the purpose for which it was intended. Whether defendant made up his mind at one time or another to purchase the cattle, or obtained the money, or credit, in one way or another, with which to make it, he availed himself of plaintiff's time and services from the beginning, in such a manner, as, inevitably, to create the impression that there was no more question in his mind than there was in plaintiff's that the transaction was an incident in the business in which they were engaged and had a common interest, and to which he had agreed to furnish the capital and plaintiff to furnish his time and services. He could not but have known that plaintiff was acting in the belief that what he (plaintiff) was doing, and what he (defendant) was doing, were equally called for by the contract, and, after plaintiff had given and defendant had accepted his time and services, it was too late, even had it been competent before, for defendant to assume to fix plaintiff's compensation, or interest, upon any other basis than as established by the contract.

[4] We conclude therefore that plaintiff is entitled to recover one-half of the net profit shown in the buying and selling of the John Saal cattle, and that, as he alleges a contract to that effect, his application of the term "partnership" to that contract, though erroneous, is immaterial. The judge a quo awarded plaintiff $500, probably because plaintiff had been offered that amount, but the suit is for a settlement of the balance to be found due, and we think a judgment for a specific amount is premature when rendered before the settlement is arrived at, and that the case should be remanded for the further liquidation of the transaction (in question) and the ascertainment of the balance that may be due to plaintiff. The defendant's reconventional demand, too, should enter into the settlement of accounts and be disposed of in the final judgment. Plaintiff's claim for damages is not well founded, and the judgment dismissing that demand will be affirmed.

The judgment appealed from is affirmed to the extent that it rejects plaintiff's demand for damages, and in all other respects the judgment is annulled. It is now ordered, adjudged, and decreed that plaintiff be recognized as having been and being interested with defendant in the purchase and sale of the John Saal cattle, on August 8, 1914, to the extent of one-half of the net profits (after deducting all expenses, charges, and losses incident thereto) which have been or may be derived from that transaction, and that this case be remanded to the district court for a full and final liquidation and settlement of accounts between plaintiff and defendant, with recognition of plaintiff's

right to recover of and from defendant one-half of said net profits. The costs of this appeal are to be borne by defendant, and the costs of the district court are to await the final judgment.

DAWKINS, J., takes no part.