138 So.2d 189 (1962)
Ivy R. PENNINGTON, Plaintiff-Appellant,
v.
Ira B. SIMMONS, Defendant-Appellee.
No. 5281.
Court of Appeal of Louisiana, First Circuit.
February 6, 1962.
Rehearing Denied March 14, 1962.
Joseph A. Gladney, Baton Rouge, for appellant.
Anthony W. Wambsgans, New Orleans, for appellee.
Before ELLIS, LANDRY and MILLER, JJ.
MILLER, Presiding Judge pro tem.
This is a suit seeking to dissolve and have an accounting of an alleged partnership between *190 the plaintiff, Ivy R. Pennington, and the defendant, Ira B. Simmons. In connection with the suit plaintiff is also seeking to recover advances made to the defendant in anticipation of profits, additional advances made for payments allegedly unaccounted for, one-half of the losses suffered by the alleged partnership in the construction of four houses and miscellaneous fees incurred for the cancellation of various liens filed by the defendant. Although plaintiff did not petition nor pray for attorney's fees, plaintiff does argue in his brief that he is entitled to $1,500.00 as attorney's fees. Defendant denied the existence of a partnership and reconvened for certain advances allegedly made by him. After a prolonged trial, the district court found that no partnership existed between the parties and consequently dismissed the plaintiff's suit as well as the defendant's reconventional demand, wherein defendant sought a refund for certain expenses which he allegedly incurred on behalf of Pennington. From that adverse judgment plaintiff appeals to this court. Defendant did not answer the appeal.
The evidence on the merits was heard by the trial court for eleven days. To illustrate the difficulty with which the trial court was and this court is confronted in reviewing this record, we point out that the defendant was called under cross-examination eight different times. The plaintiff offered 258 exhibits, many of which contained numerous subparts. Some of the ledgers, time books, and account books are only partially completed. The Certified Public Accountants who reviewed the exhibits in an effort to make an accounting gave a report on September 7th, 1956 showing a total loss to the alleged partnership of $2,583.39, but revised this figure on April 25, 1957 in the light of the additional information furnished to show a total loss to the alleged partnership of $3,708.80. All of this notwithstanding the fact that the alleged partnership existed for approximately three months and was terminated on July 2, 1956.
The exhaustive testimony is conflicting at many points, and where it is not conflicting, it is vague. Plaintiff, a man of some means who has long experience as a part time building contractor, testified that sometime in March of 1956, he contacted defendant, and as a result they entered into a verbal partnership agreement for the building of a house. Plaintiff, who was employed at Esso Standard Oil at the time, agreed to put up the finances, and defendant, who was otherwise unemployed, agreed to supervise and contribute his services and time to the job. It was the understanding of both that the profits to be derived from the enterprise were to be equally divided. Defendant was allowed to draw $100.00 a week. Plaintiff contended that this $100.00 a week draw was to be applied against defendant's share of the profits, whereas defendant contended that the $100.00 a week was not a draw but a salary which was over and above his one-half of the profits.
The first house, built for one W. H. Sibley, seemingly, was going well and plaintiff and defendant decided to undertake construction of three other houses, namely, for Jack R. Pennington (plaintiff's son), I. W. Gore and A. B. Van Norman.
Under their agreement, defendant was concerned with the active supervision of the jobs, including the hiring and firing of workmen and the procurement of necessary materials and supplies. Most of these material and supply invoices were billed directly to the plaintiff, but some were paid for by the defendant under an agreement whereby the defendant was to make certain advances for the payment of supplies, workmen, etc., and the plaintiff was to reimburse him every week.
Plaintiff testified that in the latter part of June, 1956, the defendant was becoming very negligent in his work and apparently there developed some question (in plaintiff's mind) as to whether or not defendant was using all the advances made by plaintiff to pay off the materials and supplies as he was supposed to do. By letter dated July 2, *191 1956, addressed "To all employees of Pennington & Simmons * * *" Mr. Pennington wrote as follows:
"Effective today, July 2, Mr. Simmons is no longer associated with me: the partnership has been dissolved. * * *"
He further advised the employees that he could no longer afford to have them continue in his employment but would like certain named workers to remain if they were willing to accept pay at union scale. Plaintiff states in his letter that his son-in-law, Mr. Charles E. Lee, would replace the defendant as supervisor. On June 22, 1956, the defendant had written a letter to the plaintiff outlining the current status of the various jobs and also suggesting that their association end after the completion of all four houses inasmuch as defendant felt that the plaintiff's son-in-law, Charles E. Lee, could do any future work just as well. It is to be noted that plaintiff's son-in-law was a teacher who taught nine months of the year but frequently did building work for the plaintiff during the months of June, July and August.
Plaintiff's son-in-law, Charles E. Lee, took over the supervision of the jobs on July 2nd, 1956, and completed them in due time. Plaintiff claims a partnership loss of $6,079.50 in connection with the construction of these four jobs and is making demand herein for one-half of these losses or the amount of $3,039.75. In addition, plaintiff claims that defendant withdrew as advances against the profit the sum of $1,800.00 (less a credit of $381.69 for monies advanced by defendant) or a net advance against the profit of $1,418.31. Plaintiff further claims the sum of $699.39 which it is claimed that defendant owes because this sum, advanced by the plaintiff, was not used in connection with any of the job costs as it was supposed to be used. In addition, plaintiff demands the sum of $104.36 represented by court costs and legal fees necessary for the cancellation of four liens which were filed against these jobs by the defendant and ordered cancelled by the court. Defendant denies the existence of the partnership and claims that the $100.00 a week draws were salary and were not to be applied against the profits.
The central issue is whether or not a partnership existed between plaintiff and defendant.
In finding that a partnership did not exist, our learned brother, who sat through this long and tedious trial had these comments on the testimony:
"In support of the contention of plaintiff that a partnership was formed, he offered the testimony of his daughter, of Mr. Horace Sibley and of Mr. Hugh D. Piper, who testified that plaintiff told them that he had formed a partnership with defendant. Mrs. Lee, plaintiff's daughter, further testified that her father had had a heart condition and needed some one to supervise the construction work. Mr. Charlie Lee, plaintiff's son-in-law, testified that Simmons, the defendant, told him that he was in partnership with Mr. Pennington. The testimony of all of these witnesses in reference to the partnership is very vague, even including that of the plaintiff himself as to the terms and conditions of the alleged partnership agreement. Indeed, the witnesses, other than plaintiff, based their testimony that a partnership was created upon conclusions derived from what plaintiff told them.
"One of the houses to be built by the alleged partnership and on which there was a substantial loss for which plaintiff seeks to recover one-half from the defendant was the home of plaintiff's son, Mr. Jack Pennington. The loss on the Jack Pennington house, in a large measure, resulted from changes in the specifications which increased the cost of same substantially and which Mr. Pennington, the plaintiff, testified was agreed to by the defendant over his *192 the plaintiff's protest. It hardly seems plausible and likely that if Mr. Simmons considered himself to be a partner of plaintiff and that he would be required to bear half of the losses on the partnership's undertakings that he would consent to increasing the cost to the partnership for building the home of the son of plaintiff without requiring that the son pay for same, for otherwise he, Simmons, would be deliberately causing himself a loss by such actions."
As authority for his contention that a partnership did exist, plaintiff relies primarily upon the case of Brown v. Bank of Minden (Miller, intervenor) (Miller v. Brown), 167 La. 421, 119 So. 413 (1929). Of these two cases, one, Miller v. Brown, was for an accounting, dissolution and liquidation of the alleged partnership. The other suit, one by Brown against the Bank of Minden, hinged on the partnership question and consequently they were consolidated for trial. In that case the plaintiff, Miller, who was President of the Bank of Minden, and the defendant, Brown, who was a saw mill operator, formed a partnership for the purpose of operating a saw mill and selling its product. This agreement was made in the early part of 1923. The plaintiff was to finance the business of the partnership and the defendant was to be in active charge of its affairs. Defendant was to receive a salary of $150.00 per month which was later increased to $250.00 per month and the use of a car. Profits were to be divided equally between the partners. It was also agreed that the partnership was to be operated under the name of "J. C. Brown" and an account in that name was opened in the Bank of Minden. In his answer, the defendant denied the existence of a partnership but did say that they had certain negotiations looking toward the organization of a partnership, but that the plaintiff did not at any time advance or put into the business any money whatever contrary to their agreement; hence, the partnership was never formed. The court, in finding that there was a partnership, stated that although the defendant in his answer had denied the existence of a partnership, in his testimony he expressly admitted that he was in partnership with the plaintiff from the early part of 1923 until the month of June of the same year at which time he claimed the firm was dissolved by mutual consent. The plaintiff, on the other hand, claimed the partnership did not end until May of 1927. The court, in upholding the partnership, brought out the fact that defendant did testify that there was a partnership at the beginning and that an accounting had never been made upon the dissolution of the partnership. The court pointed out that both parties repeatedly declared to persons in firms dealing with "J. C. Brown" that they were partners, doing business in that name. Numerous fire insurance policies covering the property of the firm were issued in 1925 and 1926 (during the period in which defendant Brown claimed there was no partnership) to "J. C. Brown and R. H. Miller doing business as J. C. Brown". These policies were received by the defendant and kept by him in the Bank of Minden. Thus, it can be seen that the instant case may be distinguished from the case of Brown v. Bank of Minden (Miller v. Brown), supra, in at least three respects: (1) In the Brown case, there was a partnership bank account; in this case there was not. (2) Defendant Brown, although denying a partnership in his answer, admitted in his testimony that they were in a partnership for a certain period of time at the outset. Defendant, Simmons stoutly maintains there never was a partnership. (3) Both parties repeatedly declared to persons in firms dealing with "J. C. Brown" that they were partners doing business in that name. In the instant case the preponderance of the evidence indicates that the firms they did business with made out the invoices in the plaintiff's name, extended credit solely on the basis of the plaintiff's financial reputation, sent many of their bills directly to the *193 plaintiff and looked to the plaintiff for the payment of these bills. Although there is some evidence that plaintiff Pennington referred to Simmons as his partner, this was vague and inconclusive; the overwhelming testimony shows that Simmons did not refer to plaintiff as a partner.
Counsel for appellant correctly contends that both the plaintiff and defendant agreed to share the profits of the enterprise fifty-fifty. He further maintains that the instant case is governed wholly by the following article, being LSA-Civil Code, Article 2801:
"Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry, furnished in determined proportions by the parties."
In attempting to saddle their association with the partnership label, the plaintiff uses as a sole criterion, the agreement to divide profits. While extremely persuasive as an indication of their intent to form a partnership, the agreement to divide profits in an enterprise does not, of itself, constitute a partnership. As far back as 1878 the court in Chaffraix v. Lafitte, 30 La.Ann. 631, 639, had this to say:
"* * * and that other tests must be resorted to in addition to participation in the profits, in order to determine the question of partnership vel non. Participation in the profits is one circumstance; participation in the losses is another. It is demonstrated that participation in the profits alone is not sufficient. The parties may stipulate for a participation in the profits, and that there shall be no partnership; and they may also agree to share profits and losses, and exclude partnership, since there is nothing in liability for losses, an incident of the contract of partnership, which gives it greater significance as a test of that relation than participation in profits which is also an incident of that contract. Such agreements serve to fix the rights and relations of the parties with respect to each other; and the public or third persons are not interested in or prejudiced by them, whether they are publicly avowed, or known only to the parties. The true, final, satisfactory, conclusive test is in the answer to the question: What was the real meaning and intention of the parties, as expressed in their contract, whether verbal or written? If they intended to create a partnership, they will be treated as partners inter sese and with respect to third persons: If they did not intend to create that relation, but merely to divide the profits or to share profits and losses, in a speculation or adventure, they will not be partners inter sese, nor will they be liable as such * * *"
Developing this thought further the court in Collom v. Bruning, 49 La.Ann. 1257, 22 So. 744, 747, concluded:
"Partnership is a special contract, dependent for its creation upon the consent of the parties (Rev.Civ. Code 2805) that that particular relationship should be established between them. The mere fact that two persons may both be interested pecuniarily in the same business venture, and that each gave to it equally his time and attention, by no manner of means carries with it, as a matter of law, the conclusion that they stand towards each other as partners."
In the case of Amacker v. Kent, 144 La. 545, 80 So. 717 (1919), one party had agreed to furnish capital and the other his time and services for the prosecution of the business of buying and selling cattle, with the net profits to be divided equally between them. Although in that case the struggle was over the division of the profits, as opposed to the obligation for the losses as we have here, the court's reasoning in finding *194 that there was no partnership is not only valid but elucidating:
"What the parties to a contract may have agreed upon is a question of fact; whether their agreement, such as it may be, is one which constitutes them the partners of each other, is a question of law, about which the contractants are not unfrequently mistaken. They may be held liable to third persons when, as between themselves, they are not, and never intended to be, partners; but that doctrine is applied when they hold themselves out, or are to be presumed to have held themselves out, to such third persons, as partners, is founded in the doctrine of estoppel, and is not involved in this suit. Where the question of partnership vel non is to be determined, between the parties to the contract, the main inquiry is to be directed to the ascertainment of their real intention. If it be found that they have agreed upon all those matters which, in law, constitute a contract of partnership, it must be presumed that they intended that contract. If, on the other hand, some essential element to that contract is omitted, it is not a contract of partnership, no matter what it may be called. Our Civil Code declares that
"`Art. 2801. Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry, furnished in determined proportions by the parties.'
"`Art. 2811. It is of the essence of this contract that a profit is contemplated, and that each of the parties is to partake therein. * * *'
"`Art. 2813. A participation in the profits of a partnership carries with it a liability to contribute between the parties to the expenses and losses. * * *'
"`Art. 2814. A stipulation that one of the contracting parties shall participate in the profits of a partnership, but shall not contribute to the losses is void, both as it regards the partners and third persons. * * *'
"It has, however, been held by this court that such a stipulation is not void, provided the exemption from liability for the losses is based upon a fair equivalent given to the associates by the partner in whose favor it is stipulated, and that the contract, in that respect as well as in other respects, remains in force. Consolidated Bank v. State of La., 5 La.Ann. [44] 59.
"In the instant case, plaintiff agreed, as he himself testifies, to put in his time and services against defendant's capital, and, as nothing was said about the losses, it might very well be argued that, under the law, his right to participate in the profits carries with it a liability to contribute to the losses, and that, no doubt, is true, in that the losses incurred in the business are necessarily deducted before any profit can be found, so that all partners suffer the losses in suffering the deduction. If, however, by positive stipulation, surrounding circumstances, manner of its execution, or otherwise, it appears that the parties to a particular contract intended that one or more of them should share in the profits to be derived therefrom and should not share in the losses, over and above the loss of prospective profits, though such a contract may not, under the definitions of our law, be one of partnership, it may, nevertheless, be a lawful contract, and perhaps less objectionable from a moral point of view than a contract in which one becomes liable for losses which he is not able, and has no prospect of being able, to pay. And so it is that one may share profits, by way of compensation for the time and service which he contributes to the business *195 contemplated, and yet not be liable for the losses incurred, save in so far as they prevent profits from being earned. It is immaterial, in such case, whether he be called an employe, associate, or what not; it is enough that his rights and liabilities are determined by the intention of the contract, and that neither rights nor liabilities are altogether those of a partner.
"Considering the financial positions of the parties to this suit, respectively; their silence upon the subject of a partnership relation, and of any liability on the part of plaintiff for loss to be incurred; the opening of their books, as the opening of the `cattle account' may be called, merely in that form; the fact that plaintiff drew the funds furnished by defendant, as an agent and not as a partner, drawing the funds of his firmall go to satisfy us that the contract in question was neither more nor less than as alleged by plaintiff, a contract for the establishment and conduct of a business in which he was to furnish his time and services against the capital to be furnished by defendant, and in which the profits to be derived from the purchases and sales of cattle were to be equally divided, but in which the losses, if any, sustained in the whole business, save as deductions from the profits, were to be sustained by defendant alone. * * *"
All of the contracts for the construction of the houses were entered into in the name of, and signed by, I. R. Pennington alone. No partnership account was opened in any bank and there was no partnership stationery or letterhead. There were no overt indications of a partnership. The bills for materials and labor were made out in the name of the plaintiff and either sent to him directly or were paid by the defendant who was reimbursed by the plaintiff for such expenditures.
Apparently their difficulties were brought to a head on June 29, 1956, when the plaintiff refused to recognize an itemized list submitted to him by the defendant for reimbursement. Plaintiff's conduct following this is a strong indication that he regarded Simmons not as his partner (and hence an equal) but rather as his employee or agent in this endeavor as indicated by Mr. Pennington's following testimony given a direct examination:
"Q. Let's go back to this situation on this Monday after Mr. Simmons brought you these weekly draw sheets dated June 29th or sent them to you on Sunday through Miss Ayers and then you had this conference with Mr. Simmons on the next Monday. Now, what took place at that conference and what was the result of it?
"A. Well, that was all that took place at that conference, sir.
"Q. Was Mr. Simmons to continue to be supervisor of the projects after that?
"A. No, sir, I had to remove Mr. Simmons for Mr. Simmons' own good and for mine because Mr. Simmons became very negligent in his work * *.
"Q. Now, just how did you work out this situation that resulted in Mr. Simmons no longer being the supervisor of these jobs? What was said between you and Mr. Simmons and how was it carried out?
"A. I don't remember the exact words that were said. It was a good while back and it is something * * * I don't remember the exact words.
"Q. Well, did you make it clear to Mr. Simmons that you no longer needed him to supervise these jobs?
"A. Yes, sir, I did but in the exact words I made that clear, I don't know. I do know for the benefit of Mr. Simmons *196 and myself that he had to be relieved."
Mr. Pennington stated that at the time he removed Simmons and replaced him with his son-in-law, Charles E. Lee, he expected a profit on the Van Norman, Sibley and Gore jobs, but he knew there was no possibility of any profit on his son's job. Regarding their agreement and the question of losses the following testimony of the plaintiff under direct examination is pertinent:
"Q. Now, at the time you made that agreement, an agreement to build each of these houses, as the agreements developed was there any discussion about losses?
"A. There was to be no losses. Mr. Simmons had assured me that we would have a reasonable profit in every job and we had only discussed profits. Of course, we were not figuring on any lossess occurring at all."
In the recent case of Labat v. Labat, 232 La. 627, 95 So.2d 129 (1957), the court reviewed the jurisprudence of the relationship of partners and partnerships and sets forth the principles upon which a legal partnership exists. In that case, the mother and son, who allegedly conducted a partnership for the operation of a funeral home, lived on the premises, had common access to the business records, a joint bank account, and occupational licenses issued in both their names, and they had filed partnership income tax returns. The court held that these were persuasive but not conclusive and a reading of the record showed no indication of an intention to establish a partnership and further concluded that no partnership was established. See also Glover v. Mayer, 209 La. 599, 25 So.2d 242 (1946), and Walker v. Delahoussaye, La.App., 116 So.2d 884 (1959).
We find that the evidence, taken as a whole, indicates that the parties did not intend to form a partnership. Of course, like most ventures, it would not have been undertaken had they anticipated a loss. This was simply a case of a person with financial means forming an association with someone with time and know-how. The plaintiff was to advance and risk his money and the defendant was to advance and risk his time and servicesboth in the hope of a profit, which they were to divide fifty-fifty. True this relationship, superficially, bears most of the earmarks of a partnership, principally, from the standpoint of the agreement to share the profits. However, as we have said, this factor alone, is not sufficient. Because of his lack of means we do not believe it was contemplated by the parties that the defendant should be responsible as a partner and hence responsible for losses in this relationship. The arrangement was more that of a principal and agent, or employer and employee.
Having concluded that there was no partnership, it follows that Simmons was not responsible for whatever loss there might have been. This leaves for consideration Pennington's claims for the refund of $1,418.31 net advance to Simmons against profits, for the $699.39 paid to Simmons for allegedly unsupported job costs, for the $104.36 represented by costs and legal fees required for the cancellation of four liens improperly filed by Simmons, and for $1,500.00 attorney's fees. We will consider these claims in the above stated order.
We are convinced from a study of all of the evidence in this case that the $100.00 weekly draw paid by Pennington to Simmons was an advance against Simmons' share of the expected profits rather than a salary which Simmons was to receive in addition to his one-half of the expected profits. We would therefore hold that Simmons should refund the advances had Pennington allowed Simmons to complete the four houses and had there been a loss rather than the hoped for profit as a result of their efforts and investment. However, Pennington discharged Simmons at a time when it was impossible to determine whether or not there was or could *197 have been a profit. Inasmuch as Pennington unilaterally terminated the employment prior to the completion of the four houses, Simmons had no hope of protecting whatever profit he might have had, had he been allowed to conclude the four jobs. To penalize Simmons by requiring him to refund the advances which Pennington himself had suggested that Simmons take, would be unjust under the circumstances. We find that Pennington is not entitled to this sum.
The evidence in support of Pennington's claim for $699.39 represented by unsupported job costs shown on Simmons' draw sheets is inconclusive. The total figure was reached by the auditors after considering information supplied principally by the plaintiff. We note that they considered literally hundreds of items and many conflicting claims between the two parties, several of which were indicated by qualifications in the audit itself. Although there is some evidence to sustain Pennington's claim, we hold that it is inconclusive and that Pennington did not bear his burden of proving this claim by a preponderance of the evidence.
In a preliminary hearing, the trial court concluded that the labor liens filed by Simmons on each of the four houses were improperly filed and ordered their cancellation. It follows that Pennington is entitled to recover $104.36 representing the costs and legal fees required for this cancellation.
The demand for $1,500.00 attorney's fees is neither prayed for in the petition nor is it justified by the jurisprudence, law, or facts of this case.
Accordingly let there be judgment in favor of Pennington and against the defendant in the sum of $104.36. In all other respects the judgment of the trial court dismissing Pennington's demands is affirmed. The costs shall be paid three-fourths by the plaintiff and one-fourth by the defendant.
Affirmed in part and reversed in part.