470 So.2d 367 (1985)
Eurie Phillip MARIE
v.
Gerald SAVOIE.
No. 85-CA-2.
Court of Appeal of Louisiana, Fifth Circuit.
May 13, 1985.
John H. Brooks, Gretna, for plaintiff-appellant.
Leonard K. Fisher, Jr., C. Don Irby, Boutte, for defendant-appellee.
Before BOWES, CURRAULT and DUFRESNE, JJ.
CURRAULT, Judge.
This appeal originates in the Twenty-Fourth Judicial District Court, Division "B", Parish of Jefferson, wherein the Honorable Frank V. Zaccaria rendered judgment in favor of defendant dismissing plaintiff's claim upon a finding that plaintiff failed to carry his requisite burden of proof.
Eurie Phillip Marie filed suit against Gerald Savoie alleging the two had orally formed a partnership whereby Marie would advance Ten Thousand Dollars ($10,000) to Savoie which was to be used by Savoie as the down payment on an eighteen wheeler *368 tractor-trailer. Marie alleged further that he was to have title to the rig and that Savoie was to work it and keep an accounting of the profits which were to be shared equally.
The trial court dismissed Marie's claim finding, "The testimony is vague and the court cannot conclude that the plaintiff sustained his burden of proof herein.... the requirements of our law which would sustain plaintiff's contention had not been proven in the fashion necessary for plaintiff to prevail." Marie has brought this appeal without asserting specific errors as required by our rules.[1] However, the upshot of appellant's argument, as gleaned from his brief, is that the trial judge's conclusions were not only erroneous in light of the evidence adduced at trial, but were in fact impossible.
To be considered a partnership, a business relationship must meet the following established criteria: (1) the parties must have mutually consented to form a partnership and to participate in the profits which may accrue from property, skill or industry, furnished to the business in determined proportions by them; (2) all parties must share in the losses as well as the profits of the venture; and (3) the property or stock of the enterprise must form a community of goods in which each party has a proprietary interest. Glover v. Sowada, 457 So.2d 101 (La.App. 5th Cir.1984), writs denied 461 So.2d 316 (1984); Sas Jaworsky v. LeBlanc, 239 So.2d 176 (La.App. 3d Cir.1970) writ denied, 256 La. 911, 240 So.2d 373. Even where parties who have entered into a business relationship that they themselves call a partnership, and further agree they gave their mutual consent to form it, the courts will not consider such a relationship a partnership, as between the parties, unless it is evident that the other two factors result from their agreement. Glover, supra.
Citing Amacker v. Kent, 144 La. 545, 80 So. 717 (La.1919), this court in Glover, supra, at 103, recited with approval the following:
"If it be found that they have agreed upon all those matters which, in law, constitute a contract of partnership, it must be presumed that they intended that contract. If, on the other hand, some essential element to that contract is omitted, it is not a contract of partnership, no matter what it may be called."
When determining whether the above criteria has been satisfied and a partnership actually formed, Louisiana courts will look to the nature of the agreement and the intent of the parties rather than form; and again it is immaterial whether the word "partnership" was used in establishing the business relationship. Sas Jaworsky, supra.
Marie and Savoie met sometime either in September or October of 1978. At this initial meeting, Marie proposed a business venture to Savoie. Marie asserts the two agreed he would put up $10,000 to be used by Savoie as a down payment on a truck which Marie would have title to but Savoie would operate and the profits would be shared equally. Marie testified Savoie's response to this proposal was, "Well not right now ... maybe later in a month or two. I will call you if you give me your number."
Marie decided to purchase a Tran Star II from Owens Truck Service and Sales; and pursuant to that decision he advanced to Savoie a $10,000 cashier's check dated October 27, 1978. This check was negotiated on November 28, 1978; and on November 29, 1978, Savoie purchased a Kenworth W-900 from Woodlow Truck Sales and Services.
Marie testified Savoie called him from Woodlow Trucks to inform him the Kenworth was a "nice rig," and requested that he go to the loaning bank to handle the necessary paperwork. Marie however told Savoie to handle it. Two days after the Kenworth was purchased, Marie testified Savoie called him once again and wanted to know where he could take the truck so that *369 he could view it. Marie told him Westside Shopping Center.
After hearing nothing more for approximately two months, Marie called Savoie and testified, "I raise hell at him." Marie made a formal demand that his advancement be returned which was then promptly done.
Wilbert Paul Faucheaux testified that he accompanied Marie on two occasions when Marie and Savoie met. Both meetings occurred at Savoie's job site and Faucheaux stated Marie and Savoie discussed "a partnership of some sort." Faucheaux could not recall the dates of these meetings, but did remember that, "Mr. Marie was going to put up $10,000 and they was (sic) going to buy a truck in his name and Mr. Savoie was going to go ahead and work the truck because he had facilities to work the truck in." Faucheaux stated further that there were no discussions concerning a loan, interest notes or "anything like that."
Savoie stated that there was only one meeting which took place at his home in the presence of his wife and children. Savoie's recollection of this meeting was, "Well, he had said he had $10,000 he wanted to invest in a truck, and I would work it for him at, say, a fifty-fifty base type thing. And I agreed to that." Savoie further testified he informed Marie that Marleen, Savoie's wife, would handle all the business arrangements.
Savoie testified that they were to get together at a later date to firm up such things as financing, bookkeeping, operating expenses and other related matters. The next meeting was left up to Marie because, according to Savoie, "we had no phone number to get in touch with him." Savoie testified further that he and Marie had no further meetings or discussions until sometime near the end of 1978 or beginning of 1979.
As to the Kenworth, Savoie stated that during September, after meeting with Marie, one of his personal trucks broke down and had to be replaced. He stated further that the Kenworth was purchased for his sole use and that it was never his intention that this truck was to be considered a partnership.
As to the cashier's check, which was negotiated the day before he purchased the Kenworth, Savoie stated that check was negotiated and the money was placed in a checking account and then transferred to a safety deposit box, "to make sure that money was set aside." Savoie stated with certainty that the cashier's check was not negotiated to buy the Kenworth.
Mrs. Savoie testified there was one meeting between the parties which took place at her home to discuss a business arrangement. Mrs. Savoie had no knowledge of any other meetings. Her account of that meeting is as follows:
"My husband was going to take care of running a truck, see to it that it was working, I was to handle all of the financial arrangements. Mr. Marie gave me a check, a cashier's check, for $10,000.00. Before he left he told me that he would come back within a day or two and give me whatever else was necessary to purchase a truck and to get a truck on the road, plus $5,000.00 for a checking account for operation expenses. The only agreement between Mr. Marie and my husband was my husband would keep the truck working. All of the business arrangements were made between Mr. Marie and myself."
Mrs. Savoie testified that no details, such as expenses and maintenance, were ever discussed. She testified further that although Marie was to get in touch within a few days, he never followed through. Mrs. Savoie next saw Marie in March, 1979 when she met him to return his advancement.
Mrs. Savoie corroborated her husband's testimony that the check was negotiated, placed into an account and later transferred to a safety deposit box. However, Mrs. Savoie's testimony differs from the evidence in that she stated she deposited the check promptly while the check shows otherwise.
*370 It is clear from the record that we have two completely different views regarding the facts. Marie, on the one hand, firmly believes he had a business arrangement in the form of a partnership with Savoie. Savoie, on the other hand, testified although he had an agreement of some sort with Marie, it was not a completed deal. Savoie's intentions came into focus when questioned by the court:
THE COURT:
When did you tell Mr. Marie that you didn't consider that you had a partnership with him. When did that fact....
THE WITNESS:
We never did, sir. We came to the conclusion that.... We wasn't (sic) contacted between the time he gave us the $10,000.00.... She put it into the checking account. Now, when he was going to come up with more money and a financial agreement with her, he didn't come back so she took that money out of the checking account and put it in the safety deposit box to make sure that money was set aside.
THE COURT:
Alright. You heard him say he asked you or asked your wife about the deal that you all were supposed to have, did you ever reach a point with him where he said how come we're not partners and you said something to him. Did you ever have any conversations along those lines?
THE WITNESS:
No, because we was (sic) waiting for more concrete arrangements like in monies. That $10,000.00, that was just a down payment for the tractor. And a trailer had to be purchased. And the tractor had to be rigged up for that particular trailer, insurances, taxes and all this bit.
THE COURT:
Well, when he gave you the $10,000.00 did he give it to you personally or to your wife personally?
THE WITNESS:
To my wife.
THE COURT:
Were you there at the time?
THE WITNESS:
Yes, sir.
THE COURT:
What was your conversation with him at the time of the delivery of the $10,000.00?
THE WITNESS:
I agreed, once the deal was made, but, to help him out.... I was going to see that the truck had a job. And I was going to maintain control of the truck and supply the driver for it.
THE COURT:
Did you ever talk to him about your wrecked truck at that time?
THE WITNESS:
No, sir, because I didn't talk to Mr. Marie until sometime toward the end of the year or the early part of the next year.
THE COURT:
After he gave you the $10,000.00, when was the next time you had a conversation with him?
THE WITNESS:
Oh, I'd say it was towards the end of the year after I purchased the other truck.
THE COURT:
Well, did you call him and tell him that you found a truck for him?
THE WITNESS:
I had no way of calling him. I had no phone number for him.
THE COURT:
You never did have a phone number for him?
THE WITNESS:
No, sir. It's a (sic) unlisted number.
THE COURT:
Alright.
The intent of both parties that there be a business relationship between them containing all of the major characteristics of a partnership is an essential prerequisite in establishing a partnership. A simple agreement to share profits from an enterprise is not sufficient to create the status of a partnership. Glover, supra.
*371 Although the litigants did have some type of business relationship, the plaintiff did not make a showing that that relationship contained all of the major characteristics of a partnership. It appears the only agreement between the litigants was an agreement to form a partnership in the future, and we cannot say that a partnership was created simply by the advancement of Marie.
Accordingly, the judgment of the trial court dismissing plaintiff's claim is hereby affirmed. Appellant is to pay all costs.
AFFIRMED.
NOTES
[1] Uniform RulesCourt of Appeal, Rule 2-12.4.