159 So.2d 577 (1963)
FIESTA FOODS, INC.
v.
Gordon C. OGDEN, Jr., d/b/a Cremeo Products Company.
No. 6000.
Court of Appeal of Louisiana, First Circuit.
December 16, 1963.
Rehearing Denied January 27, 1964.
*578 Franz Joseph Baddock, Baton Rouge, for appellant.
Breazeale, Sachse & Wilson, by William S. Moss, Jr., Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This action is a suit on an open account arising out of a distributorship contract between plaintiff, Fiesta Foods, Inc., sometimes hereinafter referred to as "Fiesta" or "appellant", manufacturer of hot tamales, and defendant, Gordon C. Ogden, sometimes *579 hereinafter referred to as "appellee", holder of an exclusive franchise to market, sell and distribute plaintiff's products in certain specifically designated areas of the State of Louisiana. Defendant Ogden has reconvened for damages allegedly sustained and incurred as a result of plaintiff's breach of plaintiff's contractual obligation by furnishing tamales of inferior quality thereby causing defendant financial loss. After trial below judgment was rendered in favor of plaintiff in reconvention (defendant in the main demand), Gordon C. Ogden, Jr., in the sum of $1,509.40, representing damages allowed in the sum of $1,883.00, less a credit of $373.60 found to be due plaintiff on the open account which formed the basis of the initial demand herein. Plaintiff has appealed contending the trial court erred in awarding defendant damages on the reconventional demand. Defendant, plaintiff in reconvention, has answered plaintiff's appeal praying for an increase in the damages allotted.
In approximately mid-November, 1960, defendant Ogden, as the successor to one Sonny Haynes, commenced the business of distributing hot tamales manufactured by plaintiff-appellant. A contract designated a "Franchise" was executed December 8, 1960, wherein plaintiff agreed to sell defendant as many uncooked frozen hot tamales as defendant might order, the price of such merchandise being fixed at the rate of 28¢ per dozen. The franchise also granted defendant the exclusive distributorship of appellant's hot tamales, sold under the trade or brand names "Fiesta Hot Tamales" and "Chico Hot Tamales", throughout the entire state of Louisiana, excepting only the Parishes of Orleans, Jefferson and St. Bernard. In addition, the agreement conferred upon defendant the right, inter alia, to grant distributorships and authorize sales agencies in his territory; substitute a corporation or partnership of which he might subsequently become a member as a party to the contract thus ending his individual obligation under the agreement; and extend the terms of the agreement for one year and enforcement of his rights under the franchise by injunction or otherwise.
The consideration for the rights granted defendant in the contract is therein stated as follows:
"In consideration of the efforts Gordon C. Ogden, Jr. * * * has made to sell its uncooked hot tamales in the Baton Rouge area and in consideration of his undertaking to sell its uncooked hot tamales in other areas of the state. * * *"
Having acquired the aforesaid exclusive distributorship of plaintiff's said products, defendant purchased from Sonny Haynes all equipment owned by that individual who was then plaintiff's distributor. Defendant's testimony is uncontroverted to the effect the purchase of Haynes' business and equipment occurred November 14, 1960, which date is of considerable importance as will hereinafter appear. Defendant commenced operation under the name "Cremeo Products Company" (subsequently changed to "O & W Distributors") by opening a bank account in the name of Cremeo Products Company on the date of his purchase from Haynes. The precise legal status of O & W Distributors is at issue herein and will be considered subsequently in this opinion.
After obtaining the aforesaid franchise, defendant developed a market for plaintiff's hot tamales in Baton Rouge and Shreveport, Louisiana. It is defendant's contention these markets collapsed because of plaintiff's alleged breach of the franchise agreement by furnishing inferior hot tamales which did not meet the standards of tamales sampled by defendant prior to defendant's initial purchase under the franchise agreement. Stated otherwise, defendant contends that following the agreement the tamales furnished by appellant contained insufficient quantities of meat or no meat at all resulting in customer complaints causing a loss of all defendant's retail outlets.
*580 We shall first consider the issues presented by plaintiff's main demand, namely, the balance due plaintiff by defendant on open account for hot tamales purchased.
Our careful analysis of the record reveals that both parties have made certain errors in calculating the debits and credits appearing on the account. We conclude our learned brother below correctly resolved the errors noted in the account but his explanation thereof in his written reasons for judgment is not entirely clear.
The itemized account attached to plaintiff's petition shows that between November 14, 1960 and March 7, 1961, defendant purchased from plaintiff hot tamales aggregating the sum of $2762.00. The total indicated contains a simple error in addition inasmuch as our own addition discloses the sum is properly $2792.00. Upon trial of the matter, defendant proved and plaintiff conceded the following errors in the account: a charge of $117.00 on the account, according to the original invoice, should have been $107.90, resulting in an overcharge of $9.10; a charge of $243.00, according to the original invoice, should have been $224.10, constituting an overcharge of $18.90; no credit was given for the sum of $36.40 for which defendant produced a credit memorandum. It follows, therefore, the sums of $9.10 and $18.90 or a total of $28.00 must be deducted from the debit total of $2792.00, resulting in corrected total purchases in the sum of $2764.00. It also follows the credit of $36.40 must be added to the acknowledged total payments of $1962.00 to obtain the proper credit total of $1998.40.
As thus adjusted all undisputed corrections are given full effect, resulting in a balance of $765.00 due on the open account, which figure is reached by deducting credits of $1998.40 from debits in the aggregate of $2764.00. Consequently, if plaintiff should prevail herein, the sum of $765.60 is the maximum amount plaintiff may recover.
The burning issue, however, is defendant's contention that in addition to credits shown, he is entitled to further credit for payments aggregating $392.00 which contention, needless to state, is vigorously contested by plaintiff. Insofar as plaintiff's main demand is concerned, the disputed credits of $392.00 constitute the sole issue between the litigants.
It is undisputed that defendant made the following payments not credited on the account: $200.00 on November 18, 1960; $200.00 on November 23, 1960, and $147.00 November 25, 1960, or a total of $547.00. Defendant maintains that of said total of $547.00, the sum of $155.00 was for a set of pots purchased for him by plaintiff and the remainder of $392.00 was in payment of the invoices dated November 14, November 16 and November 18, 1960, in sums of $84.00, $140.00 and $168.00, respectively, or an aggregate of $392.00. On the other hand, however, plaintiff argues the sum of $547.00 paid on the dates indicated did in fact constitute payment in the sum of $155.00 for pots purchased for defendant by plaintiff but the remainder of $392.00 was for cash purchases made by defendant prior to opening the account. In this regard plaintiff's manager, Gelpi, testified defendant made purchases totalling $392.00 prior to November 14, 1960, the merchandise being picked up at plaintiff's plant in New Orleans by defendant who transported the goods in a station wagon. According to Gelpi, defendant was supposed to pay cash for the merchandise but on each occasion used some excuse to justify his failure to have cash or a check available so plaintiff let him have the tamales. When the disputed payments were received, plaintiff entered them in his records as "cash purchases". Gelpi acknowledges he initially extended defendant a credit line of $1,000.00 but contends it soon became evident defendant was "slow pay" and he, Gelpi, would have trouble collecting the account.
Defendant, however, emphatically denied he purchased any tamales "for cash" prior to November 14, 1960, under circumstances related by Gelpi.
*581 In support of his position, defendant introduced in evidence a statement received from plaintiff covering the three initial purchases appearing on the account, namely, November 14, 1960, $84.00; November 16, 1960, $140.00 and November 18, 1960, $168.00, (a total of $392.00), to which statement he appended the following pencil notation:

 "We sent $200 to Gelpi by Western
 Union for pots which totaled $155.00
 (therefore) $45 will be applied to this
 bill. We wrote him a check today 11/23
 for $200 so our balance is392.00
 245.00
 _______
 $147.00"

The record shows that subsequent to the three disputed payments, every payment made by defendant was in an amount equivalent to one or two invoices submitted by plaintiff excepting two payments made in February and March, 1961, which closed the business relationship between the parties. Later, defendant made a final purchase of tamales for which he admittedly paid cash. Defendant consistently maintained the final cash purchase, made April 28, 1961, was the only instance in which he purchased tamales from plaintiff for cash.
Defendant's contention is further corroborated by the fact that defendant's check dated November 30, 1960, (representing the payment immediately following the disputed payments of November 18, 23 and 25, 1960, in the sum of $547.00), appearing in the record, is for the sum of $224.00 and contains on its upper left corner the notation "Envoice (sic) #380,384", which invoices are in the sum of $112.00 each or a total of $224.00 and represent the next purchases following the purchases defendant contends were paid by the three disputed checks. Defendant further explained that when he made the first three purchases shown on the account Gelpi extended him a line of credit of $1,000.00 but Gelpi, notwithstanding, commenced demanding payment on account before the account reached the agreed sum of $1,000.00. In an effort to satisfy Gelpi, Ogden paid the first three invoices by means of the now disputed checks.
Gelpi's contention the disputed payments totalling $547.00 were for pots and cash purchases made before the account was open and not charged to the account, is without substantiation. In essence Gelpi contended he extended defendant credit to the extent of $1,000.00, notwithstanding prior unrecorded "cash purchases" for which defendant did not pay and for which no statement or invoice was ever given defendant. Gelpi stated further the first purchase made by defendant was for cash which defendant paid. In this regard defendant denies having made an initial cash purchase for which payment was made and steadfastly denied making any purchases whatsoever prior to November 14, 1960. We are inclined to accept defendant's version of the transaction, as did our esteemed brother below, for the reasons indicated and also because the record is devoid of evidence which would even remotely establish that defendant commenced distributing hot tamales prior to his purchase of Haynes' equipment on November 14, 1960, consequently, prior to that date defendant would have had no use for plaintiff's products. In addition, the record contains evidence to the effect that Haynes purchased all of his hot tamales for cash and it is possible Gelpi may have become confused by the fact that Haynes and defendant visited plaintiff's plant together shortly prior to defendant's acquisition of the distributorship.
We believe, therefore, the evidence preponderates strongly in favor of defendant's contention he is entitled to further credit in the sum of $392.00. Therefore, the correct adjusted credit total on the account should be $1,998.40 plus $392.00 or $2,390.40 which sum, subtracted from the adjusted total debits of $2,764.00 leaves a balance due of $373.60 as found by the trial court. Accordingly, this finding of the trial court will be affirmed.
Defendant's reconventional demand is predicated on the contention that for approximately *582 one month following defendant's initial purchase of tamales on November 14, 1960, plaintiff furnished good tamales which were the equivalent of the samples shown defendant by plaintiff prior to execution of the franchise agreement. In the beginning defendant's business flourished and his customers were well satisfied with the quality of the tamales offered. However, the quality of the tamales rapidly deteriorated and as a result, defendant commenced receiving frequent complaints from his retail outlets in Baton Rouge and Shreveport concerning the meat content of the tamales. Stated simply, it is contended the tamales contained insufficient meat and in many cases no meat at all with the consequence many customers complained, returned tamales and were refunded their money. Defendant maintains that on numerous occasions he remonstrated with and protested to plaintiff concerning the meat content of the tamales which action produced only temporary improvement and that ultimately defendant's retail outlets requested defendant to remove his equipment from their establishments. Consequently, defendant was obliged to discontinue sales and suffered considerable loss.
At this juncture we deem it advisable to dispose of certain issues raised by defendant in reconvention by way of peremptory exceptions of no cause of action filed in this court.
The first exception to defendant's reconventional demand is based on the contention there is no allegation or proof of fraud or bad faith on the part of defendant in reconvention therefore damages are not recoverable assuming, arguendo, the hot tamales were in fact inferior as contended by Ogden. In support of this position, esteemed counsel for appellant, Fiesta, cites Louisiana Revised Civil Code Articles dealing with actions in redhibition. The reconventional demand, however, is based on contract, not redhibition. Likewise without merit is the contention the franchise is unenforceable as a contract because it allegedly contains a potestative condition in that Ogden was not obligated to purchase any certain quantity of hot tamales from Fiesta. The hereinabove quoted language in the franchise agreement obligated defendant Ogden to undertake the sale of plaintiff's products. That no specific purchases were required is of no moment. It is uncontroverted that Ogden immediately proceeded to establish outlets for the sales of hot tamales and commenced to discharge in good faith the obligation incumbent upon him. As a result of Ogden's activities a substantial volume of sales was made to him by appellant. The record leaves little doubt but that Ogden fully performed according to the franchise.
Assuming, arguendo, the franchise contained a potestative condition insofar as concerns Ogden's obligations thereunder, such circumstance is of no moment in the case at bar considering Ogden did in fact perform the obligations therein assumed. It is settled law that a potestative condition which has been fulfilled ceases to be "potestative", and where a contract has been made subject to a potestative condition, and the condition is fulfilled, the contract becomes binding and is enforceable. Signorelli v. Morice, La.App., 174 So. 124; Lee v. Abernathy, La.App., 19 So.2d 670; Hansman v. Uddo & Taormina Co., La.App., 76 So.2d 753. Moreover, a party seeking to take advantage of the lack of mutuality in an intended commutative contract must do so seasonably and not delay until the other party has executed the contract. Dockson Gas Co. v. S. & W. Const. Co., La.App., 12 So.2d 847. In the instant case plaintiff in reconvention had performed the obligation incumbent upon him of establishing a market for appellant's products. He had done what the contract called for. If appellant had wished to avoid the contract for an alleged potestative condition, appellant should have done so timely. It ill behooves appellant to raise such issue after defendant has completed his end of the bargain.
*583 The next exception filed on behalf of defendant in reconvention is dual in nature. First it is argued the reconventional demand fails to allege and the evidence fails to establish that the products furnished contained any foreign, unwholesome or deleterious substance rendering it unfit for human consumption and, secondly, there was no agreement between the parties as to the percentage ratio between the two principal ingredients of hot tamales, namely, cornmeal and meat. It suffices at this juncture to state the record shows, as found by the trial court, that tamales were furnished with no meat at all or with so little meat they did not constitute a merchantable product and did not compare in quality with samples shown to, examined, and tasted by Ogden at the time the franchise agreement was executed, therefore, plaintiff breached its contract.
Appellant excepted to the reconventional demand on the further ground plaintiff in reconvention, Ogden, is individually asserting a right belonging to a partnership or corporation known as "O & W Distributors". This contention is predicated on Ogden's answer to certain interrogatories wherein he inadvertently referred to "O & W Distributors" as a corporation and to testimony of Ogden's employee, Webb, who stated he thought the business was a partnership. In this connection it is significant to state Gelpi's testimony shows beyond doubt that, at all times, he considered he was doing business with Ogden individually and was unaware of a partnership or corporation known as "O & W Distributors". Moreover, the record conclusively establishes "Q & W Distributors" is not a corporate entity. Plaintiff next seizes upon the testimony of Ogden's employee, Webb, who testified he considered O & W Distributors a sort of unlisted partnership. The record, however, clearly preponderates in favor of the conclusion that O & W Distributors is merely a trade name for a business wholly and solely owned by Ogden, individually. Although Webb was to be paid one-half of the profits, it is uncontroverted that Ogden alone supplied all funds, made all financial arrangements and was solely responsible for losses incurred. It further appears Webb was paid a small salary since there were no net earnings and although Webb was to share equally in the profits, if any, he was in no wise accountable for any loss the enterprise might sustain.
It is settled jurisprudence that even if parties in an enterprise call the relationship a partnership and agree they will give their mutual consent to form it, it will not be considered a partnership in law as between them unless it is evident they share the losses as well as profits and that the property or stock of the undertaking forms a community of goods in which each party has a proprietary interest. Darden v. Cox, 240 La. 310, 123 So.2d 68.
Moreover, where, by agreement, one party receives for his services a share of the profits of the business but is not responsible for losses and the capital is owned by the other party, there is no partnership. Carlson v. Ewing, 219 La. 961, 54 So.2d 414; Daigle v. Crescent City Garage, La.App., 180 So. 831; Whitmeyer v. Poche, La.App., 49 So.2d 69. It has also been held a mere agreement to share profits from an enterprise is not sufficient per se to create the status of a partnership or joint venture. Pennington v. Simmons, 138 So. 2d 189.
Appellant also maintains the trial court erred in rendering judgment on defendant's reconventional demand because there is no proof in the record the hot tamales were inferior in quality or that substandard products emanated from appellant's plant. In this regard Mr. Harry Gremillion, an employee of Pak-a-Sak Stores in Shreveport testified hot tamales sold by his concern were purchased from Ogden and Webb. Mr. Pat Zinna, a butcher, employed as Market Manager by Pak-a-Sak Stores, testified hot tamales were purchased from Ogden. Two employees of Pak-a-Sak in Baton Rouge, namely, Guy Andrew Valega, Jr., *584 a butcher, and Douglas Cary, classification unstated, also testified hot tamales were purchased from Ogden. In turn, Ogden testified all tamales sold in Baton Rouge and Shreveport were purchased from appellant and none were purchased from any other source. His testimony in this respect was corroborated by his employee, Webb.
The evidence is uncontroverted to the effect the sample tamales shown Ogden and those furnished by appellant during the early stages of the business relationship between the litigants were designed to retail at 60¢ per dozen. They consisted of a seasoned cornmeal shell comprising approximately 60% of the tamale's bulk into which was mechanically inserted a seasoned meat mixture approximately the size of an ordinary lead pencil, the meat mixture comprising approximately 40% of each tamale.
Defendant Ogden testified that for the first few weeks he was in operation, plaintiff furnished satisfactory tamales but thereafter complaints began to pour in from various retailers that the tamales contained insufficient meat or no meat at all. According to Ogden and Webb they complained to appellant, returned some tamales for which either credit was given or other tamales substituted in exchange. Complaint to appellant at first brought temporary improvement but in or about January, 1961, the tamales were consistently inferior causing a loss of the entire Shreveport market which consisted of approximately 19 outlets in the Pak-a-Sak chain. In this connection Ogden is fully corroborated by the testimony of numerous witnesses who stated that they not only ate some of the tamales themselves and found them inadequate but returned customer's money with such regularity that, they, the witnesses, recommended to their employers that the Fiesta line of hot tamales be removed from their stores.
Appellant made a valiant effort to establish that the tamales, most of which were purchased frozen and required certain preparation, were improperly prepared by defendant Ogden. It suffices to say the record is barren of evidence to support appellant's contention the meat may have become dislodged from or fallen out of the tamales during the cooking and preparation procedure. The testimony of the witnesses, who both sold and ate the tamales, clearly establishes the tamales were properly prepared by Ogden pursuant to the procedure recommended by appellant and no tamales were ever returned or remained unsold because of improper preparation. In every instance the record shows tamales were returned because of customer complaints to the effect the tamales were all cornmeal and contained little or no meat. The foregoing, we believe, fully answers appellant's contention defendant may not prevail on the reconventional demand because of his failure to produce in evidence a single inferior hot tamale in its original container. Plaintiff in reconvention established by clear and convincing evidence the tamales were inferior and the substandard quality of the merchandise was the sole cause of the loss of his retail outlets.
We deem it fair to state the record contains no evidence which would justify the imputation of bad faith or fraud to appellant. There is evidence of record, however, which tends to establish that appellant was experiencing some difficulty with its machinery at about the time the differences between appellant and appellee arose. It is our judgment that the inferior tamales resulted from improper functioning of appellant's equipment. Gelpi concedes he personally made some adjustments on the machines after receiving complaints from Ogden.
Finally, plaintiff contends that appellee did not prove any loss or damages and alternatively, if a loss be shown, it did not result from inferior hot tamales. In considering this contention, we point out that a profit and loss statement covering Ogden's operations from November, 1960 to December, 1961, appearing in evidence, reveals a loss of $3,438.48. Before proceeding to a *585 closer analysis of this statement, however, it can be accurately stated the record reflects beyond doubt that the lack of meat in plaintiff's hot tamales, whether at times total or at times only partial, resulted in a product of inconsistent quality below the standard of the samples originally shown appellee and, as a consequence thereof, the market which appellee had developed for the product was lost with some attending financial loss to plaintiff in reconvention. The serious and important issue presented, however, is the extent of the loss due to appellant's breach of the franchise agreement.
The measure of damages for breach of contract is the amount of loss sustained and the profit of which one has been deprived, subject to the limitation that the defaulting party is liable, in the absence of fraud or bad faith, only for damages contemplated by, or reasonably supposed to have entered into the contemplation of the parties at the time of contract. Harper v. Home Indemnity Company, La.App., 140 So.2d 653; McWilliams v. Harper, La.App., 159 So. 454. The measure of damages, in other words, in cases of breach of contract, is that which will indemnify the party injured. Faraldo v. Ferdinand Gumbel & Co., 128 La. 287, 54 So. 821.
Where damages attending a breach of contract are uncertain, much discretion is left to the court in the assessment thereof. Meyer v. Succession of McClellan, La.App., 30 So.2d 788; Sutherlin Sales Co. v. United Most Worshipful, etc., La.App., 127 So.2d 253. In such instances damages should be moderated to make allowance for any partial uncertainty. Seaton v. Second Municipality of New Orleans, 3 La.Ann. 44. Where there is no proof of actual damages, the allowance should be for a nominal amount only. Meyer v. Succession of McClellan, La.App., 30 So.2d 788.
The proof of damages in the instant cases leaves considerable uncertainty. The general ledger introduced in evidence shows the income and expenses of the business and a profit and loss statement covers the period November, 1960 through December, 1961. There are no balance sheets, and no periodic profit and loss statements which might show the comparative profit and loss experience as between the period when saleable tamales were furnished and the time when tamales were unmarketable. If the record reflected a profit when tamales were satisfactory as against a loss when they were inferior, the loss due to inferior products could be more readily ascertained. Although the general ledger offered by appellee contains such expenditures as cost of tamales, taxes, insurance, vehicle operation and other similar business expenses in the aggregate of $7,551.03, (only $2,764.00 of which represents the original cost of appellant's tamales), there is no showing the indicated loss was occasioned solely by appellant's breach of contract. It might well be that a portion of the cost shown resulted from inefficient management, excessive operation costs or normal loss attending a new operation. In any event, there appears no sound basis on which the court could award the entire sum demanded by plaintiff in reconvention. Moreover, it appears reasonably certain a portion of the cost listed by appellee represents the purchase of equipment having some salvage value which would further reduce appellee's loss.
In view of the foregoing, we conclude only nominal damages can be awarded in the instant case and, considering the circumstances shown, an award of $500.00 will do substantial justice herein.
Having determined appellee is indebted to appellant in the sum of $373.60 on the open account sued upon, and appellee is entitled to damages in the amount of $500.00, it follows appellee is entitled to judgment on the reconventional demand in the sum of $126.40.
Accordingly, it is ordered, adjudged and decreed the judgment of the trial court in favor of appellee and against appellant be and the same is hereby amended and revised *586 in that the amount of the award to plaintiff in reconvention, Gordon C. Ogden, Jr. d/b/a Cremeo Products Company, and against defendant in reconvention, Fiesta Foods, Inc., is reduced from the sum of $1,509.40 to the sum of $126.40, and judgment rendered herein in favor of said Gordon C. Ogden, Jr. d/b/a Cremeo Products Company and against said Fiesta Foods, Inc. in the sum of $126.40, together with legal interest thereon from date of judicial demand, until paid; all costs of the suit below as well as costs of this appeal to be paid by appellant, Fiesta Foods, Inc.
Amended and affirmed.