893 F.2d 1488
 Weldon P. TAQUINO, Plaintiff-Appellant,
v.
TELEDYNE MONARCH RUBBER, et al., Defendants-Appellees.
TELEDYNE MONARCH RUBBER, etc., Plaintiff-Appellee,
v.
Weldon P. TAQUINO and E.P.I., Inc., Defendant-Appellants.
ADVANCED INDUSTRIAL AND MARINE SERVICES, INC. Plaintiff-Appellee,
v.
Weldon P. TAQUINO, Defendant-Appellant.
 No. 88-4740.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 12, 1990.
 
 N. Elton Dry, Pravel, Gambrell, Hewitt, Kimball & Krieger, Houston, Tex., for plaintiff-appellant.
 Thomas S. Keaty, Keaty & Keaty, Rutledge C. Clement, Jr., Amelia J. Williams, Koch, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendants-appellees.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before GARZA, WILLIAMS and DAVIS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 This appeal stems from three consolidated civil suits. The suits arose out of the various business relationships of appellants Weldon P. Taquino and E.P.I. Inc., and appellees Teledyne Monarch Rubber ("TMR") and Advanced Industrial Marine Services ("AIMS").
 
 
 2
 We state the facts only briefly. They are presented in detail in the opinion of the district court upon which we rely and which is attached as Appendix A. Taquino and TMR entered a contract (their third) under which Taquino, an independent contractor, undertook to serve as TMR's exclusive agent to sell offshore drilling rig rubber products, including energy absorbing cells, in the Gulf of Mexico region, and as manager of TMR's fabrication services (assembling components into the finished products). Taquino was to be paid on a commissions basis.
 
 
 3
 A year later, TMR terminated its fabrication operation, assigned Taquino's contract to AIMS, and made AIMS its sole distributor of TMR offshore rubber products. Taquino continued to take orders for TMR products which he sent directly to TMR rather than AIMS. He accepted payment, however, of certain commissions from AIMS. He resigned six months later.
 
 
 4
 During this same period, Taquino also engaged in several activities in preparation for manufacturing and marketing his own energy-absorbing cell which would compete with the TMR cell. He discussed the cell with potential customers, contacted several potential suppliers of component parts and services, and consulted a patent attorney who initiated a patent search.
 
 
 5
 Upon Taquino's resignation, TMR refused to pay certain commissions that Taquino claimed were due. TMR asserted that Taquino had breached the contract because he had used in his advertising for his company, E.P.I., some materials identical to TMR's materials. The allegation was that he had also made sales in direct competition with TMR/AIMS.
 
 
 6
 Appellants Taquino and E.P.I. sued appellees TMR and AIMS, seeking to collect the unpaid commissions allegedly due under contract. Appellee TMR separately sued appellants, claiming patent infringement, Lanham Act violations, breach of contract, unfair competition and deceptive trade practices in violation of the Louisiana Unfair Trade Practice statute, and misappropriation of trade secrets. Taquino and E.P.I. counterclaimed product disparagement and violations of federal antitrust law. AIMS filed a state court Petition and Application for Temporary Injunction against Taquino, which was removed to federal district court. These suits were consolidated into the present case.
 
 
 7
 The district court issued its Findings of Fact and Conclusions of Law on the issue of liability. It concluded that Taquino had breached his contract with TMR/AIMS, and had violated the Louisiana Unfair Trade Practice and Consumer Protection Law, La.R.S. 51:1401-18. After a later trial on damages, the court issued Supplemental Findings of Fact and Conclusions of Law as to the damages. The court awarded TMR lost profits amounting to $17,511.62, and, pursuant to Louisiana law, $136,213.75 in attorney's fees. The court also awarded AIMS $10,000 in nominal damages.
 
 
 8
 We affirm on the basis of the carefully considered and thorough opinion of the district court on liability, attached as Appendix A. We also affirm all but one of the damage awards rendered later in the supplemental order as supported by the record. The one award we find in error is the $10,000 nominal damages. We find the amount awarded is excessive. We vacate that award and remand for reconsideration of nominal damages not to exceed $2000.
 
 
 9
 We consider briefly the nominal damages award. The district court awarded AIMS the nominal damages based upon its recognition that, although AIMS was entitled to recover lost profits[1], AIMS failed to introduce any evidence of its profits or losses. Louisiana Civil Code Article 1999 states that "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." La.C.C. Art. 1999. There was no showing, however, that AIMS for some reason could not have produced evidence by which to measure its damages. Consequently, the district court properly concluded that an award of any amount except nominal damages would be pure speculation and conjecture. "Louisiana law is quite clear on this point: when items of damage are of a nature susceptible to proof of amount, and the plaintiff can prove them but does not, only nominal damages may be awarded." Standard Plumbing Supply Co. v. U.S. Steel Corp., 703 F.2d 802, 804 (5th Cir.1983); Fiesta Foods, Inc. v. Ogden, 159 So.2d 577 (La.App.1963); Meyer v. Succession of McClellan, 30 So.2d 788 (La.App.1947). Any loss of profits that AIMS might have sustained falls into this category. See Standard Plumbing Supply, supra at 804.
 
 
 10
 Although the court correctly held that it could award only nominal damages, we find the $10,000 awarded AIMS to be excessive. While Louisiana law does not limit nominal damages to any specific or fixed amount, the cases do give us some guidance as to a suitable amount. In Standard Plumbing Co., supra, 703 F.2d at 805, pursuant to Louisiana law, this court vacated the district court's award of $50,000 "actual" but unproved damages for breach of contract, and remanded for an award of nominal damages not to exceed $1000. The Louisiana court in Fiesta Foods, Inc. v. Ogden, supra, considered $500 an appropriate award of nominal damages in a breach of contract action. In an action for breach of loan-servicing agreement in which plaintiff bank asserted damages of $135,000, but offered no proof of actual loss, the court awarded $5000 nominal damages. A.E. Landvoigt, Inc. v. La. St. Emp. Ret. S., 337 So.2d 881 (La.App.1976). See also Lowe v. Jones, 519 So.2d 379 (La.App.1988) (court reduced award of $4000 nominal damages for trespass to $1000); Ryland v. Taylor, Porter, Brooks & Phillips, 496 So.2d 536 (La.App.1986) (court awarded $1500 nominal damages for injury to plaintiff's personal and professional reputation due to malicious civil prosecution).
 
 
 11
 Under the facts and circumstances of this case, in which TMR only recovered approximately $17,000 actual damages, the district court's award of $10,000 to AIMS is excessive as "nominal". We therefore vacate the $10,000 damages award to AIMS and remand for reconsideration and entry of an award of nominal damages not in excess of $2000.
 
 
 12
 AFFIRMED IN PART, VACATED IN PART AND REMANDED.
 
 APPENDIX A
 
 13
 Civ. A. Nos. 84-1999 "L", 85-0117 "L" and 85-1367 "L"
 
 
 14
 United States District Court Western District of Louisiana
 
 Lafayette-Opelousas Division
 Filed Nov. 19, 1987
 Weldon P. Taquino
 
 15
 v.
 
 Teledyne Monarch Rubber, et al
 CONSOLIDATED WITH:
 Teledyne Monarch Rubber
 
 16
 v.
 
 Weldon P. Taquino, et al
 CONSOLIDATED WITH:
 
 17
 Advanced Industrial & Marine Services, Inc.
 
 
 18
 v.
 
 Weldon P. Taquino
 FINDINGS AND CONCLUSIONS
 
 19
 DUHE, District Judge.
 
 
 20
 These consolidated cases present an ever changing kaleidoscopic view of facts and legal issues. Nine days of trial, scores of exhibits, and over three hundred pages of post-trial briefs (without table of contents or index) have done little to stop the motion of the kaleidoscope and define its pattern. The matter has been under advisement since August 27, 1986, and has received more time and attention than any other single case in this court. By these findings and conclusions, I shall attempt to stop the motion and firmly fix the pattern of this kaleidoscope.
 
 Basically, the claims to be resolved are:
 
 21
 1. Nature and validity of the Taquino-TMR/AIMS contract.
 
 
 22
 2. Commissions, if any, due Taquino by AIMS an/or TMR.
 
 
 23
 3. Validity of U.S. Patent 4,363,474. (474).
 
 
 24
 4. Whether that patent, if valid, is unenforceable due to misuse.
 
 
 25
 5. Violation by TMR and AIMS of the Sherman Anti-Trust Act, Sec. 1 and 2.
 
 
 26
 6. Infringement of U.S. Patent 4,363,474 by Taquino and EPI.
 
 
 27
 7. Violation of the Louisiana Unfair Competition Law (La.Rev.Stat.Ann. 51:1401 et seq.)
 
 
 28
 8. Violation by Taquino and EPI of Sec. 43(a) of the Lanham Act (15 U.S.C. 1125(a)).
 
 
 29
 9. Appropriation of TMR trade secrets by Taquino in violation of his contract and the Louisiana Uniform Trade Secrets Act (La.Rev.Stat.Ann. 51:1431 et seq.)
 
 
 30
 10. Breach of the contract of January 1, 1983.
 
 
 31
 11. Product disparagement, by TRM and AIMS.
 
 FINDINGS OF FACT
 I. The Parties
 
 32
 Weldon P. Taquino ("Taquino") is an individual resident of Lafayette Parish, Louisiana.
 
 
 33
 E.P.I., Inc. ("EPI") is a Louisiana corporation domiciled in Lafayette Parish, organized in October 1983, owned and controlled by Taquino.
 
 
 34
 Teledyne Monarch Rubber ("TMR") is a division of Teledyne Industries, Inc., which is a California corporation with its principle place of business located outside Louisiana.
 
 
 35
 Advanced Industrial Marine Services, Inc. ("AIMS") is a Texas corporation with its principle place of business in Houston, Texas.
 
 II. The Relationships
 
 36
 A. Taquino and TMR--employee or contractor?
 
 
 37
 Taquino spent seventeen years employed by Teledyne Movable Offshore (another division of Teledyne Industries, Inc.) engaged in supervision of its work of constructing offshore platforms and related structures for the oil and gas industry. In late 1980, TMR began investigating the possibility of entering the offshore rubber products business. It was put in touch with Taquino who arranged for TMR executives to become acquainted with products then in use. After a period of study, TMR executives decided to begin manufacturing and selling a line of marine rubber products and, because of his extensive knowledge in the field, Taquino was released by Teledyne Movible Offshore so that he could become associated with TMR.
 
 
 38
 By contract dated May 15, 1981 (TMR Exhibit 1) Taquino and Lynnhart Corporation, the incorporated personality of Bob Hartley, became independent sales representatives for TMR in the United States Gulf of Mexico region, to sell the offshore rubber products of TMR for a period of two years on a commission basis. It provided further that they would be responsible for all costs of conducting their business, specifically including the compensation due any individuals employed by them. Taquino and Lynnhart were required to represent no other manufacturer of rubber products but could, and did, represent manufacturers of other than rubber products.
 
 
 39
 TMR contracted to indemnify and defend Taquino and Lynnhart against any patent infringement lawsuit and to extend all applicable written and implied warranties of its products to Taquino's and Lynnhart's customers. Taquino concedes that, pursuant to this agreement, he was an independent contractor and not an employee of TMR.
 
 
 40
 In June of 1982 the original contract was cancelled by mutual consent and a new contract was entered into between TMR and Taquino (TMR Exhibit 5) and TMR and Lynnhart. The Taquino contract retained him as exclusive agent in the Gulf of Mexico region and additionally required him to manage TMR's fabrication services. TMR had decided to not only sell component rubber products but also to assemble those components into finished products such as fendering systems for use offshore and to sell both components and completed systems.
 
 
 41
 The contract provided that Taquino would be compensated on a commission basis and he was guaranteed a monthly fee of $3500 until commissions exceeded that amount on a monthly basis or until cumulative commissions exceeded $42,000 in a calendar year. TMR further agreed to reimburse normal business expenses for the conduct of business by Taquino in accordance with the published rules of the company. In the rough drafts of this contract which were admittedly prepared by TMR, every reference to "employment" or to Taquino as an "employee" was deleted.
 
 
 42
 On January 1, 1983 TMR and Taquino entered into a final contract (TMR Exhibit 6, EPI Exhibit 99). Its provisions were basically the same as the contract entered into in 1982 except that more detail was spelled out concerning the reimbursement of expenses and the manner in which reimbursement was to be sought; the requirement that Taquino furnish a status report to Teledyne twice per month; a provision for payment of commissions under certain conditions after the termination of the contract by either party; and the removal of any reference to minimum commissions or to a draw against commission. The contract extended Taquino's appointment to additional territory and additional customers. Again any reference to employment was avoided.
 
 
 43
 In none of the contracts between TMR and Taquino was provision ever made for vacation time, withholding of taxes, fringe benefits, health or life insurance, or other matters which are normally the subject of employment contracts.
 
 
 44
 The final contract accorded Taquino the privilege of assigning his contract to a corporation owned by him which he did after his formation of EPI. The contract was silent as to any right of TMR to assign.[1]
 
 
 45
 At the time the 1982 contract between TMR and Taquino was made, TMR officials discussed hiring Taquino as a direct employee and the decision was made not to do so.
 
 
 46
 It was TMR's policy to require employees to sign an "invention agreement" acknowledging that all inventions were the property of TMR and requiring certain confidentiality. Taquino was never asked to sign such an agreement.
 
 
 47
 Under both the 1982 and 1983 contracts Taquino was an independent contractor who was entitled to reimbursement of certain expenses. He was not an employee.
 
 
 48
 The 1983 contract between TMR and Taquino provided in pertinent part the following:
 
 
 49
 7. Taquino during the term of this Agreement shall not represent any other manufacturer of rubber products. If Taquino should initiate the termination of this Agreement, Taquino will refrain from selling any competitive rubber products or association with a competitive company for a two-year period. If Teledyne terminates this Agreement, Taquino is not bound by this clause.
 
 
 50
 * * *
 
 
 51
 * * *
 
 
 52
 11. Taquino shall not disclose any technical data, trade secrets, customer lists or other information relating to Teledyne's offshore product line received or developed by him from or through Teledyne by virtue of this Agreement and not generally available to the public from other sources, except as any such disclosure may be consistent with the sales of such offshore product line or with the other regular operations of Taquino under this Agreement.
 
 
 53
 * * *
 
 
 54
 * * *
 
 
 55
 12. Either party on thirty (30) days written notice to the other shall be entitled to terminate this Agreement for just cause, but without prejudice to any rights of either party to monies due or to become due under this Agreement.
 
 
 56
 Upon termination of this Agreement, 50% of all commissions for sales on Taquino's account list regardless if sale was made directly by Taquino or Teledyne will be paid by Teledyne to Taquino for a period of one (1) year.
 
 
 57
 * * *
 
 
 58
 * * *
 
 
 59
 16. Upon the termination of this Agreement, for any reason, Taquino shall discontinue the use of the Company's name, letterhead, business cards, trademarks, labels, copyrights, and other advertising materials and shall remove all signs and displays relating thereto; and, in the event of failure to do so, Teledyne may itself remove such articles at Taquino's expense.
 
 B. Taquino and TMR and AIMS
 
 60
 In 1982, TMR contracted with AIMS establishing it as a representative to sell TMR's rubber products in Texas under a commission arrangement similar to that which it had with Taquino.
 
 
 61
 The offshore rubber products line represented only two to three percent of the sales of TMR and was not particularly profitable. As noted, TMR manufactured and sold component energy absorbing parts but also fabricated those parts into boat landings, barge bumpers and other completely fabricated systems. Fabrication presented numerous problems.
 
 
 62
 In October of 1983 George Caplea became vice-president of sales for TMR and resolved to do something about the low profit margin in the offshore rubber products line. He was of the opinion that fabrication of component parts into completed systems should be abandoned. Taquino advised to the contrary. In his view, TMR's best customer for these products Tenneco, Inc., would buy only completely fabricated systems. Additionally, it is noted that Taquino's commissions were substantially greater on the sale of fabricated products than on the sale of component parts.
 
 
 63
 TMR entertained proposals from Taquino and AIMS to take over the sales of the entire TMR offshore product line. Taquino submitted a proposal in September of 1983 which was revised in early December. AIMS submitted a proposal in early January 1984. TMR did not inform Taquino or AIMS of the other's proposal. The Taquino proposal required substantial financial commitments by TMR. The AIMS proposal did not.
 
 
 64
 After considering the proposals, TMR decided to terminate fabrication and to accept AIMS' proposal and make it the sole distributor of TMR offshore rubber products. AIMS would also do, or cause to be done, all fabrication. When he learned of this, Taquino objected on the basis that AIMS did not offer sufficient technical ability and expertise to provide the necessary services to customers and that Tenneco would not deal with a distributor but had made it clear that it would deal only directly with TMR.
 
 
 65
 TMR then attempted to have AIMS and Taquino contract directly because it was interested in keeping Taquino involved. After numerous exchanges and discussions, no agreement could be worked out. On February 24, 1984, TMR assigned to AIMS Taquino's contract with it (TMR Exhibit 7). TMR then entered into a distributorship agreement with AIMS on March 1, 1984 (TMR Exhibit 11). While Taquino's contract provided that he was manager of fabrication and services, AIMS employed an engineer in May of 1984 to provide actual engineering services, new product development and technical sales. Taquino is not a registered engineer. He did supervise some fabrication.
 
 
 66
 Following the assignment of his contract to AIMS, Taquino continued to sell TMR products but sent orders directly to TMR rather than through AIMS.
 
 
 67
 Effective on July 15, 1984 Taquino resigned.
 
 
 68
 III. Who Breached the Contract?
 
 A. Possible Breaches Before July 15, 1984
 
 69
 Before Taquino left TMR on July 15, 1984, he did some conceptual drawings of an energy absorbing cell of his own, discussed it with several potential customers who were customers of TMR and contacted numerous potential suppliers of component parts preparing for the manufacture of a cell of his own. In early 1984, Mr. Gasser, then with Cooper Tire Company visited with Taquino and a Cooper Tire engineer. They discussed shock cells and the "donut concept" of shock absorption (which concept is used in the EPI product) and subsequently sent some drawings to Taquino.
 
 
 70
 Taquino discussed with Mr. Tenneyson of Tenneco, Inc. (TMR's best customer) the means and methods by which he could get EPI on Tenneco's approved vendor list in place of TMR and he submitted to Tenneco certain of the necessary documents to accomplish this. In late June of 1984, Mr. Tenneyson wrote to his superiors with Tenneco recommending EPI for inclusion on the approved vendor's list.
 
 
 71
 Taquino met with his patent attorney and showed him a sketch of the cell he intended to build and asked the attorney's advice regarding patentability. The attorney undertook to have a patent search conducted on June 4, 1984.
 
 
 72
 In May of 1984, Taquino discussed with representatives of Marc Tool Company the building of several component parts for his proposed device and had, before that time, an excellent idea of what the construction of such a product would cost. He contacted Colonial Rubber Company before July 15 regarding component rubber parts as well as had conversations with Bertin Rubber and several other suppliers or potential suppliers of component parts and services in May and June of 1984. At the same time EPI's employee Mr. McClendon was checking on laboratories which could perform tests on rubber products and in May of 1984 Taquino discussed with Pittsburgh Testing Laboratory the testing of a prototype product.
 
 
 73
 Further, Taquino conducted a market survey and made the information of that survey available to Mr. Gasser with Cooper Tire Company. He also discussed the results with Mr. Van Camp of TMR.
 
 
 74
 As above noted, TMR decided to cease fabrication before July 15, 1984 which had the potential to reduce Taquino's commissions and would do away with much of his duties as fabrication supervisor. While their contract made Taquino Manager of Fabrication, it had no express requirement that TMR remain in the fabrication business. Further, it assigned his contract to AIMS which then hired an engineer whose duties could duplicate much of Taquino's fabrication management responsibility. Additionally, some of Taquino's customers, notably the Aminol account, were transferred to AIMS on the basis that their places of business were in Houston. The Taquino-TMR contract provided for this. This matter was ultimately resolved, however, by a sharing of commissions between himself and AIMS.
 
 
 75
 There was some delay in the payment of commissions due Taquino. Additionally some commissions were reduced (Taquino Exhibit 134) but this was permitted by Paragraph 4 of their contract. TMR continued to accept Tenneco orders via Taquino for sales made in April and May of 1984. Payment was received by TMR after July 15, 1984 and it did not pay commission to Taquino because it considered he had violated the contract with it by being in competition with it.
 
 B. After July 15, 1984
 
 76
 As above indicated, TMR has not paid certain commissions.
 
 
 77
 Taquino used advertising materials and drawings identical to TMR materials and made sales of his product in direct competition with TMR.
 
 
 78
 IV. & V. [The facts as to the Patent and the possible infringement involving the rival energy absorbing cells are omitted from this printing.]
 
 VI. Test of EPI Cell
 
 79
 AIMS, through an intermediary, purchased an EPI shock cell and sent it to Pittsburgh Testing Laboratories where it ordered the cell subjected to a 400,000 pound axial load pushing inward on the inner pipe member or a deflection inward of the inner member of twelve inches, whichever first occurred. The laboratory report (EPI Exhibit 80, TMR Exhibit 53) indicates that the 400,000 limit was reached after ten and one-half inches of axial deflection. An inspection window was then cut in the outer cylinder of the cell by TMR, a rubber sample was taken from the compression rings inside and photographs were taken showing the cell, tears in the compression rings and some distortion of the rings as well as a bent steel plate. AIMS later circulated copies of these photographs to six persons in the industry contending that they were photographs of the EPI cell which had failed in normal use.
 
 
 80
 There was no evidence adduced of the specific loss of any given sale or opportunity to bid or any monetary damage resulting from the display of the photographs.
 
 
 81
 The court is convinced that the purpose of AIMS and TMR was to test the EPI cell to failure.
 
 
 82
 Taquino learned that the photographs were being circulated as depicting an EPI cell which failed in normal use and contacted an executive of TMR who agreed to have the practice stopped. He took steps to accomplish this and, after some time, the circulation of the photographs terminated. The photographs were only shown to representatives of Omega, Texas Eastern, CBS engineers, Kerr McGee, Service Machine and Supply Company, Inc., and Gulf Oil Corporation. It was not uncommon in the industry for pictures of competitors allegedly failed shock cells to be displayed to potential customers.
 
 VII. Deceptive Advertising
 
 83
 TMR and AIMS contend that Taquino and EPI have been guilty of deceptive advertising.
 
 
 84
 The EPI sales brochure (TMR Exhibit 30) depicts the compression cell as containing a continuous cylinder of rubber. It in fact contains four rubber "donuts". There appears to be a discrepancy in the deflection limit between what is stated in the brochure and what is indicated in the graphs and load deflection curves in the brochure.
 
 
 85
 The drawing of a typical bridge slide pad and a typical isometric boat landing used by EPI and Taquino to solicit sales of these items appear to be exact or almost exact replicas of drawings TMR had done by McDermott Engineering and Brown & Root and which came into Taquino's possession while he was employed by TMR.
 
 
 86
 There is no evidence that anyone in the industry has been significantly mislead by any inaccuracy or apparent inaccuracy in EPI literature.
 
 
 87
 All the items advertised in the EPI brochure are not carried in stock. While this is not stated in the brochure, it is in the nature of the items that a customer would expect that the majority of them would be custom engineered to the customer's uses.
 
 
 88
 There is no evidence that EPI equipment sold to customers has not performed substantially in accordance with the specifications contained in the sales materials.
 
 
 89
 The evidence is unclear, and therefore TMR and AIMS have not borne the burden of proof, that the TMR Exhibit 45 dated June 27, 1983 of a typical bridge slide pad was in fact drawn in 1983 although it is typical of the device offered by TMR.
 
 
 90
 The boat landing drawing used by EPI is likewise typical of that previously offered by TMR. However, TMR no longer offers this product not because of any action by EPI, but because it is no longer licensed by Eddie Guilbeau, inventor of the "torque ring" to manufacture and sell that item. The Teledyne drawing does not contain any notice of copyright and indeed there is no copyright thereof.
 
 
 91
 Finally, there is no showing that any misrepresentation, if indeed misrepresentations exist, or loss of any TMR customer to EPI is due to false advertising. There is no showing of material deception.
 
 VIII. Conversion of Property
 
 92
 In addition to the findings previously made, the court finds that TMR was not deprived of any drawing or other property whatsoever. To the extent that such may have been used by Taquino and EPI, the use thereof was not thereby deprived to TMR and AIMS.
 
 IX. Sherman Act
 
 93
 Taquino and EPI contend that TMR and AIMS have violated Secs. 1 and 2 of the Sherman Act.
 
 
 94
 The only evidence as to the relevant market was testimony of Earl Spicer, International Vice President of Marine Sales for Regal Rubber Company, a competitor of TMR and EPI. He testified that in 1985 TMR had 50-55% of the Gulf market; Regal Rubber Company had 15-20%; Marine Rubber Company had 15-20%. The remaining percentage was presumably held by Taquino and EPI and any others who may be in the market. Worldwide he stated that Regal and Marine controlled the majority of the market and TMR the minority share. No other evidence regarding relative market or market share was produced.
 
 
 95
 No evidence was produced as to damages caused by anti-trust violations, if indeed there were any, or loss of jobs or opportunity to bid jobs as a result thereof.
 
 
 96
 AIMS filed suit against Taquino and EPI in the state courts of Texas. Defendants removed to the United States District Court for the Southern District of Texas which then transferred to this court and this proceeding.
 
 
 97
 The other suits noted in the caption hereof by TMR are pending.
 
 
 98
 The previous findings made relative to the tests run on EPI's cell are relevant to this claim. Certain other patent infringement claims reflected by the pleadings herein have been voluntarily discontinued.
 
 
 99
 AIMS is an independent contractor and does not constitute a single economic entity with TMR.
 
 X. Misappropriation of Trade Secrets
 
 100
 Although originally contending that Taquino misappropriated numerous trade secrets, these claims were, during the course of the trial, reduced to claims concerning the conductor guide stablizer and that Taquino used his knowledge gained while under contract to TMR and AIMS of upcoming jobs in order to make competing bids for those jobs.
 
 
 101
 There is no evidence that other competitors of TMR did not have the same job information and were not able to and did not in fact bid the same jobs.
 
 
 102
 Likewise no evidence was presented showing that the conductor guide stabilizer was kept confidential from anyone outside TMR. In fact, Exxon personnel were intimately involved in its testing.
 
 CONCLUSIONS OF LAW
 
 103
 This court is vested with jurisdiction because of the diversity of citizenship of the parties.
 
 
 104
 I. Nature and Validity of Taquino-TMR/AIMS Contract
 
 
 105
 Non-competition agreements are not enforceable against employees unless the employer has expended substantial sums training the employee, or unless the employer has so advertised the employee's relationship with the product or service as to make the purchasing public equate the two. La.Rev.Stat.Ann. art. 23:921 (West 1986); Orkin Exterminating Co. v. Foti, 302 So.2d 593 (La.1974); Commonwealth Life Ins. Co. v. Neal, 669 F.2d 300 (5th Cir.1982).
 
 
 106
 However, Taquino was not an employee but was an independent contractor and such agreements are enforceable as to him if not unreasonable in some respect. Simpson v. Kelly Services, 339 So.2d 490 (2nd Cir.1976); see also Gold and Suckle, Inc. v. Suckle, et al, 335 So.2d 713 (2nd Cir.1976), writ den. 338 So.2d 700 (1976). Their contract provides that if TMR terminates the agreement Taquino is free to compete. However, if Taquino terminates he is precluded for a period of two years from selling any competitive rubber products and from associating with a competitive company. The two year period is reasonable. Gold, supra.
 
 
 107
 There is no territorial limitation in the non-competition clause. A restrictive covenant which contains no territorial limitation is unreasonable as written, and cannot be enforced in accordance with its terms. See Moorman & Givens v. Parkerson, 127 La. 835, 54 So. 47 (1911); accord Merrill, Lynch, Pierce, Fenner & Smith v. Stidham, 658 F.2d 1098, 1101 (5th Cir.1981) (Georgia law); Kutka v. Temporaries, Inc., 568 F.Supp. 1527, 1536 (S.D.Tex.1983).
 
 
 108
 This finding makes it unnecessary to consider whether there is consideration for the agreement. See Gold, supra.
 
 
 109
 The provision of the contract prohibiting Taquino from competing with TMR/AIMS following termination is not enforceable.
 
 II. Commissions Due Taquino
 
 110
 Issues of the amount which might be due Taquino under his contract with Teledyne/AIMS and all other questions of amount of damage were reserved for a latter date. Taquino's right to claim commissions is determined in connection with Item 10 hereof.
 
 III. Validity of the 474 Patent
 
 111
 ... [T]he 474 patent is valid.
 
 
 112
 IV. Has the 474 Patent Been Misused?
 
 
 113
 Taquino/AIMS argue that the 474 patent is unenforceable because this suit for its infringement is baseless and constitutes misuse. The suit itself and the difficulty this court has had in sorting out the matter speak clearly that the claims of infringement of the 474 patent are not without ample foundation in fact and law. The bringing of this lawsuit does not constitute misuse of that patent.
 
 V. Sherman Act Violations
 
 114
 a. Monopoly
 
 
 115
 Taquino/EPI contend that TMR/AIMS have prosecuted these claims of patent infringement and trade secret appropriation in bad faith in an attempt to monopolize the industry in violation of 15 U.S.C. Sec. 1.
 
 
 116
 To be successful Taquino/EPI must prove specific intent of TMR/AIMS to monopolize; that they took steps to achieve this result; and that the scheme had a dangerous probability of success. North Mississippi Communications, Inc. v. Jones, 792 F.2d 1330 (5th Cir.1986); Dimmitt Agri Industries, Inc. v. C.P.C. International, Inc., 679 F.2d 516 (5th Cir.1982) and cases cited therein. They must provide sufficient evidence to define the relevant geographic and product market. Dimmitt, supra at 525. This requirement relates to the "dangerous probability" factor. The evidence produced in this case relative to market (pps. 2119-2120 supra) falls far short of that goal. If anything, it shows that TMR/AIMS do not have the power to control price or to exclude competition.
 
 
 117
 Prosecution of this infringement claim as to the 474 patent, a valid patent, is not in bad faith (see Sec. 6, infra ). While two other patents were also originally included, the evidence has shown that claims relative to them were dropped from the suit within a reasonable time after discovery showed no offending device had been built. This can hardly be said to be in bad faith. Proof that the allegations were wrong falls far short of the proof of intimidation. The authority relied upon by Taquino/AIMS is application only to unfounded suits brought in bad faith. That is not the case here.
 
 
 118
 As to the allegation that TMR/AIMS brought the trade secret claims for the purpose of monopolizing the market the evidence is grossly insufficient. This Court finds that the claimed trade secrets are not in fact trade secrets. (See IX, infra ). But this alone is insufficient to establish a Sherman Act violation. As noted there is no evidence of intent to monopolize, and no evidence that such a scheme, if it existed, had a dangerous probability of success.
 
 
 119
 b. Restraint of Trade
 
 
 120
 Taquino/EPI contend that TMR/AIMS have conspired to restrain trade by the same basic actions they argue established an attempt to monopolize. No discussion of the law relative to this issue is found in the proposed conclusions of law submitted by counsel leading the court to believe that this contention has been abandoned. However, counsel have sought to raise, argue, and contend for every conceivable issue in this case so the failure to refer to the applicable law will be credited merely to oversight.
 
 
 121
 To prevail, Taquino/EPI must prove an agreement between TMR/AIMS which unreasonably restrains trade to their detriment. J.T. Gibbons, Inc. v. Crawford Fitting Co., 704 F.2d 787, 791 (5th Cir.1983). The only agreement proven between TMR and AIMS makes AIMS distributor of TMR products and responsible for any fabrication. It is also proven they worked together in testing the EPI cell and in circulating the photos thereof. There is absolutely no evidence that these concerted actions restrained trade. As noted above, the evidence of relative market is necessary and in this case insufficient. Sports Center, Inc. v. Riddell, Inc., 673 F.2d 786, 790-791 (5th Cir.1982).
 
 
 122
 Claims of Sherman Act violations are not proved.
 
 VI. Infringement
 
 123
 The devices are not equivalent. There is no infringement.
 
 
 124
 VII. Violation of Louisiana Unfair Trade Practices and Consumer Protection Law
 
 
 125
 All parties claim the other has violated the Louisiana Unfair Trade Practices and Consumer Protection Law (La.Rev.Stat.Ann. 51:1401 et seq. (West 1987)). The Taquino/EPI claim came by way of oral motion to amend made at the commencement of trial. There is no justification for raising this as a separate issue at the last moment and it will not be considered. Earlie v. Jacobs, 745 F.2d 342 (5th Cir.1984); Ross v. Houston Independent School District, 699 F.2d 218 (5th Cir.1983); Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539 (5th Cir.1980); Daves v. Payless Cashways, Inc., 661 F.2d 1022 (5th Cir.1981).
 
 
 126
 TMR/AIMS argue that Taquino was guilty of unfair trade practices when he, while still under contract with them, solicited their customers and developed his competing device. Taquino/EPI begged the question by arguing that he had the right to do these things after he terminated his contract.
 
 
 127
 Unfair trade practices are not defined by the statute. The definition is left to courts to be established on a case by case basis. Dufau v. Creole Engineering, Inc., 465 So.2d 752 (La.App.1985); Roustabouts, Inc. v. Hamer, 447 So.2d 543 (La.App.1984). A practice is unfair when it offends established public policy, and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Coffey v. Peoples Mortgage & Loan of Shreveport, 408 So.2d 1153 (La.App.1981). Therefore, TMR/AIMS must prove some element of fraud, misrepresentation, deception, or other unethical conduct on the part of Taquino. Dufau supra at 758. Taquino's action before July 15, 1984 looking toward developing his own competing product, getting his company on the Tenneco list of approved vendors, and patenting his own device, while perhaps not so egregious as the conduct in Dufau and Roustabouts supra, constitutes unethical, deceptive conduct and was a breach of his duty to his principals under their contract. While he may have had every right to do those things after his contract was terminated, he had no right to do so before. He thereby violated La.Rev.Stat.Ann. 51:1401, et seq.VIII. Lanham Act Violations
 
 
 128
 TMR/AIMS contend that Taquino/EPI violated 15 U.S.C. Sec. 1125(a) by making false descriptions or representations in their advertisements in that they:
 
 
 129
 (1) Depict their device as having a single rubber cylinder when it in fact consists of four rubber donuts.
 
 
 130
 (2) Depicted twelve inch deflection capability when eleven and one-half inches of deflection is the maximum possible.
 
 
 131
 (3) Used Teledyne drawings to depict bridge slide pads and boat landings.
 
 
 132
 (4) Over represented the number of products available.
 
 
 133
 (5) Advertised TMR's customers as EPI customers.
 
 To succeed it must be proved that:
 
 134
 (1) Taquino/EPI made a false statement of fact about their product; (2) statements deceived or had the capacity to deceive a substantial segment of potential customers; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) Taquino/EPI caused its products to enter interstate commerce, and (5) TMR/AIMS has been or is likely to be injured as a result. Skil Corp. v. Rockwell International Corp., 375 F.Supp. 777, 783 (N.D.Ill.1974).
 
 
 135
 Assuming without deciding that the above five allegations were proved, this court finds that:
 
 
 136
 A. The deceptions were not material in that they were not likely to influence the purchasing decision.
 
 
 137
 B. The statements did not actually deceive nor did they have the capacity to deceive a substantial number of potential buyers.
 
 
 138
 C. The alleged false and deceptive "advertising" is not the type of activity the Lanham Act was designed to prevent.
 
 
 139
 TMR/AIMS simply have not produced evidence to support the claims that potential buyers would be influenced by any of the alleged false advertising. The bridge slide pad and boat landing drawings are generic illustrations not design drawings of specific products. Each is custom built to the customers specifications. The buying public is aware of this. Additionally, no promise was made in the advertising material that all items were in stock and on the shelf. Any buyer would have known that many items had to be fabricated on an order by order basis because of their nature. They were not, therefore, likely to be mislead. The fifth allegation refers to information given only to Tenneco and does not, in this court's opinion, constitute advertising as that term is used in the Lanham Act.
 
 
 140
 This court can find no Lanham Act violation.
 
 IX. Appropriation of Trade Secrets
 
 141
 TMR/AIMS contend design and function of their conductor stabilizer and knowledge of jobs which would soon be let are trade secrets misappropriated by Taquino giving rise to a violation of La.Rev.Stat.Ann. 51:1431 et seq.
 
 
 142
 Trade secret is defined in Sec. 1431, in pertinent part, as follows:
 
 
 143
 "Trade secret" means information ... that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
 
 
 144
 Insofar as knowledge of which jobs would be coming up in the future for bid, TMR/AIMS have made no showing that others in the industry did not have the same information and were not in position to bid in competition with them. Nor have they made a showing of any efforts made by TMR/AIMS to keep this information confidential. This information, therefore, has not been shown to be a trade secret.
 
 
 145
 Likewise, no evidence establishes that information pertaining to the conductor guide stabilizer was the subject of any effort at all to maintain its secrecy. In fact, the evidence establishes that Exxon employees were intimately involved in the testing and perfection of the device and there is an absolute void of evidence showing effort to maintain secrecy. Accordingly, this information is not a trade secret.
 
 X. Breach of Contract
 
 146
 Taquino/EPI claim TMR/AIMS breached the contract of January 1, 1983 by assigning some of his customers to AIMS, by assigning his contract from TMR to AIMS, by terminating fabrication, and by failure to pay commissions.
 
 
 147
 TMR/AIMS claim Taquino breached the contract by developing his competing product while under contract, by soliciting TMR customers while under contract, and by converting its trade secrets and other property to his use.
 
 
 148
 This court has earlier determined that assignment of the contract by TMR to AIMS was not a breach and finds nothing in the evidence presented at trial to cause it to change that opinion.
 
 
 149
 No provision of the contract obligated TMR to remain in the fabrication business and counsel points to no law which requires it. The contract expressly afforded the right to reassign customers and readjust commissions in the manner that was done.
 
 
 150
 As noted below, this court finds that Taquino breached the contract. Having done so, he cannot claim the benefits of it to afford himself commissions coming due following his breach.
 
 
 151
 The contract forbade Taquino from representing a competing company prior to termination. This is a valid provision. By designing and seeking to patent and build his own competing device, and by taking steps to have his company added to the approved vendor list of Tenneco, TMR's best customer, Taquino did breach his contract. See, e.g., Dufau, supra.
 
 
 152
 Further, Taquino used TMR drawings in his sales materials. The contract properly prohibited this. The right to claim this breach of contract is not preempted by the copyright laws. Universal Gym Equipment, Inc. v. Atlantic Health & Fitness Products, 229 U.S.P.Q. 335 (D.Md.1985). 17 U.S.C. Sec. 301 only preempts rights equivalent to the exclusive rights within the general scope of the copyright law. A right is equivalent if the mere act of reproduction, distribution, or display infringes it. 17 U.S.C. Sec. 106; Allied Artists Pictures Corp. v. Rhodes, 496 F.Supp. 408 (S.D.Ohio 1980), aff'd, 679 F.2d 656 (6th Cir.1982); Harper & Row Publishers, Inc. v. Nation Enterprises, 723 F.2d 195 (2nd Cir.1983). This action for breach of contract involves an element in addition to mere reproduction, distribution or display: the contract promise made by Taquino, therefore, it is not preempted. Smith v. Weinstein, 578 F.Supp. 1297 (S.D.N.Y.1984), aff'd, 738 F.2d 419 (2nd Cir.1984); Nimmer, Nimmer on Copyright, 16.04[C] 1985).
 
 
 153
 TMR/AIMS further contend that Taquino is guilty of the quasi offense of conversion because of his use of the engineering drawings in question. This claim would, however, appear to be preempted. There is no evidence that TMR was deprived physically of its property. The evidence is simply that the property was used by Taquino/EPI in that they reproduced, distributed and displayed it. There is therein no element in addition to those covered by the copyright laws. 17 U.S.C. Sec. 301, Schuchart & Associates Professional Engineers, Inc. v. Solo Serve Corp., 540 F.Supp. 928 (W.D.Tex.1982).
 
 XI. Product Disparagement
 
 154
 While originally contending a cause of action for product disparagement, counsel have sought to now make it into libel, slander and defamation. The facts found do not address themselves to issues other than the product itself.
 
 
 155
 The elements of the offense of product disparagement are publication, with malice, of false allegations concerning the property or product, and the causing of pecuniary harm. Systems Operation v. Scientific Games Development Corp., 555 F.2d 1131 (3rd Cir.1977); Restatement (Second) of Torts, Sec. 623(A); W. Prosser, The Law of Torts, 919-922 (4th Ed.1971).
 
 
 156
 In this case, there is no evidence of pecuniary harm. It is true that the issue of damages, if any, to any parties were reserved for latter trial but this did not relieve of the burden to prove a nexis between the alleged disparagement and some loss of business, not necessarily in terms of dollars and cents. In fact, an attempt was made to establish this fact, but all that evidence showed was that the persons to whom the allegedly disparaging photographs were shown simply called on Taquino for an explanation. While it is clear to this court that an effort was made to disparage the product in that the product was tested to failure, in a manner which had nothing to do with whether or not it infringed upon the patent and photographs of the result were circulated accompanied by the statement that the cell had failed in normal use, there is no evidence of a nexis between this activity and any loss of business....
 
 
 
 [1]
 La.C.C. Art. 1995 provides that damages in a breach of contract action "are measured by the loss sustained by the obligee and the profit of which he has been deprived."
 
 
 [1]
 This court has previously decided TMR had by law the right to assign the contract